MOORE, J.
I, The plaintiff, Lydia Clare Bulloch, appeals a judgment of partition pursuant to her divorce from the defendant, Robert Brian Bulloch, M.D. She alleges six factual and legal assignments of error in the trial court’s division of the community assets. Dr. Bulloch answers the appeal, and alleges two assignments of error of his own. For the following reasons, we amend the judgment below in part, reverse in part, and affirm in part.
FACTS
Lydia Clare Bulloch (“Lydia”) and Robert Brian Bulloch (“Brian”) were married on August 8, 1992. Lydia filed a petition for divorce on September 12, 2013. The parties were divorced on October 31, 2014.
The parties appeared before a hearing officer pursuant to local rules on the partition action on January 9, 2015. The hearing officer issued a report and recommendation on March 2, 2015. Both parties filed objections to the hearing officer’s recommendation. Those objections were tried before the court in a three-day trial ending on September 4, 2015. The court issued written reasons for judgment on February 26, 2016, which was followed by a formal judgment pursuant to those written reasons signed on April 15, 2016.
DISCUSSION
By her first assignment of error, Lydia contends that the trial court erred as a matter of law when it ruled that Brian was entitled to reimbursement of the rental value of the former matrimonial domicile. Contrary to the hearing officer’s recommendation, the court awarded Brian a reimbursement sum of $18,700, representing one-half of the fair rental value of the former matrimonial domicile for the period from October 2014 (the |2month of the divorce judgment) to the date of the partition judgment (April 15, 2016). Lydia contends, however, that the issue of rent was determined when she was awarded sole occupancy and exclusive use of the home by a court order issued by Judge Benjamin Jones on October 30, 2013. At that time, the court did not award the rental value of the home, nor was the issue of rental value deferred by agreement for a decision in future partition proceedings. Therefore, she argues, Brian waived his right to receive fair rental value pursuant to La. R.S. 9:374(C), which reads:
A spouse who, in accordance with the provisions of Subsection A or B of this Section, uses and occupies or is awarded by the court the use and occupancy of the family residence ... shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided. If the court awards use *933 and occupancy to a spouse, it shall at that time determine whether to award rental for the use and occupancy, and if so, the amount of the rent. The parties may agree to defer the rental issue for decision in the partition proceedings. If the parties agreed to at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.
Lydia cites several cases holding that the assessment of rent under La. R.S. 9:374(C) requires an agreement between the spouses or a court order for rent contemporaneous with the award of occupancy. In Racca v. Racca, 1999-2948 (La.App. 1 Cir. 12/22/00), 775 So.2d 689, the court held that when there is no evidence of court-ordered rent or an agreement between the parties, the spouse occupying the family home is not liable for rent. In Manno v. Manno, 2001-2138 (La.App. 1 Cir. 10/2/02), 835 So.2d 649, the court rejected an assignment of error raised by the appellant alleging that the trial court erred by denying her request to file an amended descriptive list to assert a claim for reimbursement for the rental value of the family home occupied by her former husband. The court ruled that because there was no agreement or court order for rent for use and occupancy of the family ^residence, by the clear terms of La R.S. 9:374(C), the appellant’s husband was not liable for rent.
A panel from this court in Mason v. Mason, 40,804 (La.App. 2 Cir. 4/19/06), 927 So.2d 1235, writ denied, 2006-1524 (La. 10/13/06), 939 so. 2d 366, explained:
In McCarroll v. McCarroll, 96-2700 (La. 10/21/97), 701 So.2d 1280, the Louisiana Supreme Court held that rental payments may not be retroactively assessed under La. R.S. 9:374(C) unless otherwise agreed by the spouses or ordered by the court. The court reasoned that the use and management of a thing held in indivisión is determined by agreement of all the co-owners. A co-owner is entitled to use the thing held in indivisión according to its destination, but he cannot prevent another co-owner from making such use of it. Nevertheless, it is well established that a co-owner need not pay rent to another co-owner for his exclusive use of the co-owned property. The assessment of rent under La. R.S. 9:374(C) requires an agreement between the spouses or a court order for rent contemporaneous with the award of occupancy. McCarroll v. McCarroll, supra. When there is no evidence of court ordered rent or an agreement between the parties, the occupying spouse is not liable for rent. Gay v. Gay, 31,974 (La.App. 2 Cir. 6/16/99), 741 So.2d 149.
To award Brian’s reimbursement claim for one-half of the rental value, Lydia argues, would be to effectively charge her for use of her home—assessing her rent for her occupancy retroactively—without either an agreement by the parties or a court order to that effect. This would violate La. R.S. 9:374(C) and the rule established in McCarroll v. McCarroll, supra.[1] Therefore, she maintains that the trial court committed legal error by failing to follow the statute and jurisprudence, and, accordingly, the award should be reversed.
Our review of the record shows that Lydia was given exclusive use and occupancy by virtue of an “interim” order issued by the court on UOctober 30, 2013, *934 the Honorable Benjamin Jones presiding. Held only six weeks after Lydia filed the divorce petition, the hearing was not intended to determine use and occupancy of the family home, but concerned approximately $500,000 in community funds which Brian alleged that Lydia had misappropriated about the time she filed the divorce petition. During the hearing, Lydia stated that Brian had been coming to the house when she was not there, and this made her feel uncomfortable. Otherwise, the issues of occupancy and exclusive use and rental value were not raised by either party.
At the conclusion of the hearing, the court issued its ruling regarding the funds in question. Then, on its own motion, it made the following order:
In the interim, since Dr. Bulloch has acquired another residence—it shouldn’t be necessary to say this—but the court on an interim basis orders that the former matrimonial domicile will in [sic] the exclusive use of Ms. Bulloch and the boys.
Subsequently, following the January 9, 2015, partition hearing, Brian’s demand for fair rental value of the family home which he made in his answer to Lydia’s divorce petition and reconventional demand was rejected by the hearing officer as a result of the interim order issued by Judge Jones. The hearing officer’s recommendation stated:
Because of the October 80, 2013, judgment, which awarded exclusive use to the former Mrs. Bulloch, did not also make an award of rental value, the issue of rent may be considered at this time, in connection with the partition, only if the parties agreed to defer the rental value issue to the partition. Unfortunately, the order signed on October 30, 2013, does not mention any agreement of the parties to defer the rent claim to the partition.
Accordingly, since there was no evidence of such an agreement to defer the rent issue to the partition hearing, the hearing officer recommended that Brian’s rent claim could not be considered and should be denied.
15At trial, Brian introduced an exhibit regarding the fair market rental value of the home, and the parties agreed to submit their arguments in briefs. The trial court found that Judge Jones did not intend to bar Brian’s claim for fair rental value when he issued the interim order. The focus of the October 30, 2013, hearing concerned the community funds Lydia had allegedly appropriated, and Judge Jones entered an order directing Lydia to account for the funds in question. It noted that Judge Jones awarded Lydia exclusive use of the former matrimonial domicile “on an interim basis,” mindful that a hearing officer conference had already been scheduled to address this issue. The court concluded that the record established that Judge Jones did not intend to make a permanent disposition with respect to exclusive use, but only issued the order to ensure the welfare of Lydia and the children pending the scheduled hearing officer conference.
Our review of the record shows that Lydia requested exclusive use and occupancy of the family home in her petition, and fair rental value in case the court awarded Brian use and occupancy of the family home. Brian demanded fair rental value of the home in his answer to Lydia’s petition and his reconventional demand. Both parties requested a hearing to show cause why their requests should not be granted. These issues and others were slated to be heard at a hearing officer conference originally scheduled for December 3, 2013.
We find no legal error in the trial court’s ruling. La. R.S. 9:374(B) states, in perti *935 nent part, that “either spouse may petition for, and a court may award to one of the spouses, after a contradictory hearing, the use and occupancy of the family residence ... pending further order of the court.” (Emphasis added.) Likewise, R.S. 9:374(C), upon which Lydia relies, | fiexpressly states that its provisions apply to the awards of use and occupancy pending divorce or partition of the community property made “in accordance with the provisions of R.S. 9:374(A) and R.S. 9:374(B),” which, as noted above, require a contradictory hearing. Although the court awarded Lydia use and occupancy of the family home “on an interim basis” at the October 30, 2013, hearing concerning the misappropriated funds, the record is clear that there was no contradictory hearing on the issue of use and occupancy and whether Brian was entitled to rental value. Brian properly demanded rental value of the home in his answer and reconventional demand' along with a contradictory hearing on the mátter to which he was entitled under La. R.S. 9:374(B).
We find no error in the trial court’s award of fair rental value for the former matrimonial domicile to Brian. This assignment is without merit.

The Advanced Surgery Center

By her second assignment of error, Lydia contends that the trial court manifestly erred in determining the value of the community interest in the Advanced Surgery Center (“ASC”) to be $663,112. She complains that the determination was clearly wrong because it relied solely on the opinion of Brian’s expert, Carlton Clark. She argues that Mr. Clark’s evaluation was flawed for failing to include a growth rate and erroneously deducted Brian’s personal goodwill from the valuation.
Brian also contests the trial court’s valuation of ASC in his answer to- Lydia’s appeal. He argues that the court should have used the current market value of his membership, valued at $326,000.
Brenda Wallace is the administrator of ASC, a limited liability corporation. ASC is a facility that provides surgical services for only |7outpatient surgeries. ASC is owned by 14 members, 10 of whom, including Brian, are physicians affiliated with the Orthopaedic Clinic. Of the four members not affiliated with the Orthopaedic Clinic, one is a corporation, Surge Center Development (“SCD”). SCD has 30% ownership of ASC, and it is responsible for managing the day-to-day operations of the surgery center.
ASC provides surgical services for surgeons to perform surgeries on some of their patients. Ms. Wallace testified that only approved members of the medical staff may perform surgeries at ASC. When a physician such as Brian Bulloch performs a surgery on a patient at ASC, billing and payment for his surgical services are made by the Orthopaedic Clinic; ASC bills the patient separately for the services it provides such as use of the room and for certain procedures.
The surgery center has 98 units. Brian purchased 5 units in the surgery center when it opened, giving him a 6.1% ownership interest. Ms. Wallace said that the number of units that each member physician was allowed to purchase was established from his or her historical volume of surgeries calculated over a period of time. The individual physician ownership interests in ASC range from 3.5% to 7%.
Brian receives periodic (apparently monthly) distributions from ASC for his ASC membership interest that are not based per se on the number of surgeries he performs in the periods covered by the distributions, although he must perform a certain percentage of his surgeries at ASC to avoid “disassociation” from ASC. Ms. Wallace testified.-that Dr. Bulloch would *936 still receive income as long as he is a partner of ASC irrespective of whether he performed surgeries; however, to remain a partner, the operating | ^agreement of ASC requires that he perform a certain percentage of his surgeries or procedures at ASC. So, if he failed to perform any surgeries, he would be subject to being kicked out (“disassociated”) as a participating member of ASC. Nevertheless, the amount of money he receives in distributions is based on his percentage of ownership, not the number of surgical procedures performed.
The operating agreement of ASC provided for the purchase of a disassociated member’s units; however, the agreement and provisions constituting disassociation did not include divorce or partition of community property as a disassociation event. Accordingly, the trial court found that the provisions for disassociation of the operating agreement of ASC were not triggered in the partition proceeding, and therefore, the valuation method pursuant to disassociation provided for in the operating agreement did not apply. We will not disturb this finding, and accordingly, reject the $325,000 valuation based on market value asserted by Brian.
The trial court determined that the value of ASC at the time of the trial was $663,112, a valuation based upon a “rebuttal report” made by Brian’s expert, Carlton Clark, and entered as Exhibit F (Brian #11) at trial. In the rebuttal report, Mr. Clark used the methodology of Lydia’s expert, Patrick Lacour, the “income method,” for determining the value of the ASC, but, Lydia maintains, he reached a lower valuation due to two notable differences from Mr. Lacour’s report: the capitalization rate and an allocation of personal goodwill. In the first instance, Lydia argues that Mr. Clark did not include a growth rate when developing a capitalization rate, which, she maintains, is contrary to proper valuation practices. In the second instance, she complains that Mr. Clark included a deduction in the valuation |9attributable to Brian’s “personal goodwill.” Her expert, Mr. Lacour, did not include an adjustment for personal goodwill because Brian is neither an employee, officer, nor board member of ASC. According to Lydia, Brian is an investor in ASC who performs a percentage of his outpatient surgeries at ASC. The Orthopaedic Clinic, not ASC, bills Brian’s patients and pays Brian for the surgical procedures he performs. As a result of his membership in ASC, which constitutes a 5.1% share of ownership, Brian receives significant monthly distributions from the corporation. These distributions are not related to his surgeries, she argues, because ASC does not pay Brian for the surgical procedures he performs at ASC. Mr. Clark admitted that the essential differences in his report and Mr. Lacour’s report were the different “weighted average cost of capital” percentages applied to the cash flow. Otherwise, the cash flow calculations of both experts are substantially similar until they apply the different rates. Mr. Clark testified that his calculated rate, 22.5%, differed from Mr. Lacour’s rate, 14.5%, primarily because of the assigned specific company risk and the assigned growth rate. The other main difference in the two reports was Mr. Clark’s subtraction of personal goodwill from the value.
The income method of valuation was based on a determination of ASC’s average “income stream” over a period of operation and was used to determine the value of Brian’s 5.1% membership/ownership interest. The trial court found this final calculation to be $663,112, as calculated by Mr. Clark. As noted above, Mr. Clark’s valuation was significantly lower than the valuation of Mr. Lacour, even though the same “income method” was used.
*937 | inLydia complains on appeal that Mr. Clark did not include a growth rate component in his capitalization rate. She notes that, at trial, Mr. Clark could not cite any jurisprudential authority to support his omission of a growth component. Lydia maintains that excluding a growth rate component from the capitalization rate actually produced a discount rate. Therefore, she argues, Mr. Clark’s calculated value for ASC was incorrect.
Brian contends that Mr. Clark used a growth rate of 0% because it prevented Lydia from participating in post-judgment growth of ASC. He maintains that a growth component in the capitalization rate is typically excluded in divorce valuations. He cites both La. R.S. 9:2801(A)(4)(a) (“The court shall value the assets as of the time of trial on the merits”), and cites Statham v. Statham, 43,324 (La.App. 2 Cir. 6/11/08), 986 So.2d 894, writ denied, 2008-1578 (La. 10/10/08), 993 So.2d 1288, in his appeal brief as jurisprudential support for this claim. However, in our review of the Statham v. Statham published opinion, we find no mention of the issue of a growth component in the capitalization rate anywhere in the case.
Nevertheless, we find no abuse of discretion in the trial court’s acceptance of Mr. Clark’s method of evaluation in this regard. As noted by the panel in Ellington v. Ellington, 36,943 (La. App. 2 Cir. 3/18/2003), 842 So.2d 1160, writ denied, 2003-1092 (La. 6/27/03), 847 So.2d 1269, a court may accept parts of the valuation elements of opposing experts thereby creating a hybridized evaluation. Considering the fact that Lydia no longer will have an interest in ASC from the date of judgment, we cannot say that the trial court’s decision to accept Mr. Clark’s capitalization rate that included a 0% future growth rate is clearly wrong.
InThe more difficult question involves Mr. Clark’s deduction for personal goodwill. Mr. Clark valued Brian’s 5.1% membership in ASC at $1,174,566, of which he determined that $730,649 consisted of enterprise and personal goodwill—30% for the former and 70% for the latter. Accordingly, he deducted $511,454 from the value of Brian’s interest in ASC for his personal goodwill pursuant to La. R.S. 9:2801.2. Lydia contends that the deduction for Brian’s personal goodwill is improper, inasmuch as Brian is not an employee, officer or board member of ASC. Brian maintains that his membership in ASC is an extension of his medical practice and includes the personal goodwill arising from his patient base and practice.
La. R.S. 2801.2 states:
In a proceeding to partition the community, the court may include, in the valuation of any community owned corporate, commercial, or professional business, the goodwill of the business. However, that portion of the goodwill attributable to any personal quality of the spouse awarded the business shall not be included in the valuation of a business.
Prior to Ellington v. Ellington, supra, and the subsequent enactment of La. R.S. 2801.2, the jurisprudence distinguished “between a ‘profession’ which, generally speaking, had no ‘goodwill,’ and a commercial business, which could and often did, have ‘goodwill.’ ” A. Carroll & Richard D. Moreno, 16 La. Civ. L. Treatise, Matrimonial Regimes, § 2:9 (4th ed. 2016). The Ellington case involved a family cotton business, the Noble Ellington Cotton Company (“NECC”), for which both spouses worked. The husband primarily negotiated deals with suppliers and buyers while his wife ran the office. The trial court concluded that Mr. Ellington was the “heart and soul of the business,” giving the company a certain intangible value that did not | iafit *938 the usual definition of goodwill, but consisted of “the customer base which the company has built through the years.” Ellington, supra at 1169, The trial court treated this asset, i.e. the customer base,as the equivalent of goodwill and included it in the valuation of the company.
As a result of the Ellington decision, the legislature enacted the first version of La. R.S. 9:2801.2 which recognized that if the community asset is a “commercial business,” then the court may include goodwill in the valuation, “However, the second sentence of the statute preclude[d] the consideration of ‘goodwill’ in valuing the business ‘when goodwill results solely from the identity, reputation, or qualifications of the owner or from his relationship with customers of the business [customer base],’ ” thereby treating this community owned business like NECC equivalent to a professional practice. A. Carroll & Richard D. Moreno, op cit., § 2:9.
In 2004, the statute was amended and reenacted to its current version quoted above. The 2004 version permits inclusion of a goodwill valuation “of any community owned corporate, commercial, or professional business,” but provides that the personal goodwill of the spouse awarded the business shall not be included in the valuation of the business. See Clemons v. Clemons, 42,129 (La.App. 2 Cir. 5/9/07), 960 So.2d 1068, writ denied, 2007-1652 (La. 10/26/07), 966 So.2d 583 (“Where one spouse holds a professional degree or license and the goodwill results solely from that professional’s, personal relationship with clients, that goodwill is not included in the community”); Rao v. Rao, 05-59 (La.App. 1 Cir. 11/4/05), 927 So.2d 356, writ denied, 05-2453 (La. 3/24/06), 925 So.2d 1232. (The court stated “it is inappropriate to use such goodwill attributable to Dr. Rao in the valuation of community corporate stock,” citing Katherine S. Spaht & |1sRichard D. Moreno, 16 La. Civ. L. Treatise: Matrimonial Regimes, § 7.27 (2nd ed. 1997; 2004 pocket part)). Since the statute permits certain types of goodwill to be used in the La. R.S. 9:2801.2 valuation, the court should first value the entire business including total goodwill. Then total goodwill should be. separated into personal and enterprise goodwill for purposes of applying R.S. 9:2801.2.
Turning now to the instant case, Lydia contests Mr. Clark’s $730,649 total goodwill valuation constituting part of ASC’s total valuation, as well as the 70% deduction from this figure, $511,454, constituting Brian’s personal goodwill. With regard to the total goodwill valuation, the trial court made a credibility determination in favor of Brian’s expert, Mr. Clark, in this regard. We do not find any indication that Mr. Clark’s reasons are “patently unsound,” and thus defer to the trier of fact. The question is to what extent is any of the total goodwill valuation attributable to Brian’s personal goodwill.
Lydia maintains that because Brian is not an employee, officer or board member of ASC, there is no goodwill possessed by ASC that is attributable to his personal goodwill. By contrast, Brian maintains that his relationship with his patients that he sends to ASC for outpatient surgeries constitutes personal goodwill included in the total goodwill valuation. According to La. R.S. 9:2801.2, the value of his personal goodwill should be deducted from the valuation.
The testimony on record indicates that ASC generates income by providing facilities and surgical services for surgeons and their patients. Most of the surgeries performed at ASC are performed by physician member/owners like Brian; however, other nonmember surgeons with | ^credentials to perform surgeries at ASC are permitted perform surgeries there. It is safe to say *939 that virtually all income of ASC is generated by surgeries and other medical procedures performed at the facility, and the member owners divide the profits among themselves according to their share of ownership. It is also clear that the “heart and soul” of the business operations at ASC depends largely on the goodwill that its member/surgeons bring to ASC by sending their patients to ASC for their surgeries as an extension of their medical practice. This goodwill each member brings arises from his or her personal medical skills and patient base. Without the patient base provided by the surgeon/members to ASC, the income of ASC would be greatly diminished along with its total value. We conclude, therefore, that the trial court did not err by accepting Mr. Clark’s deduction for Brian’s personal goodwill in the valuation of the community interest in ASC. Accordingly, the trial court’s valuation of the community interest in ASC at $663,112 will not be disturbed.
By her third assignment of error, Lydia maintains that the trial court manifestly erred by accepting Mr. Clark’s valuation of the Orthopaedic Clinic, which it determined to be $19,500 per the Shareholder Agreement instead of using the valuation of her expert, Mr. Lacour, who concluded that the full value of the clinic is $1,960,530. The great disparity in the two values is a result of the method of valuation employed. The trial court found that the Shareholder Agreement of the Ortho-paedic Clinic governed the valuation, while Lydia maintains that the Shareholder Agreement is not controlling because she did not sign the agreement. Accordingly, the pivotal issue in this assignment is whether the trial court erred by enforcing the | ^Shareholder Agreement regarding Lydia’s community interest even without her signature to the agreement.
Both parties cite Rao v. Rao, 2005-0059 (La. App. 1 Cir. 11/4/2005), 927 So.2d 356, writ denied, 2005-2453 (La. 3/24/06), 925 So.2d 1232, as case authority for the proposition that a signed Shareholder Agreement controls the methodology to be used in valuing the corporation. Brian contends that, under Rao, Lydia’s signature on the agreement is not necessary for the agreement to govern the valuation, whereas Lydia argues that the Rao is factually distinguishable because the wife in Rao signed the Stockholder’s Agreement. In Rao, the valuation in dispute was a corporation operating an outpatient surgery center. Each of the six member physicians owned an equal share of the corporation. The physicians and their wives signed a Stockholder’s Agreement and later signed an amended Shareholder Agreement that established a stipulated value of $25,000 for the stock of each equal stockholder in the event of resignation, death, termination as a stockholder, or in the event of divorce. Mrs. Rao claimed that she did not consent to the amended Stockholder’s Agreement because she was presented only a spouses’ signature page to sign and was unable to review the amended agreement. Dr. Rao contradicted this claim, and testified she was given the whole document to review and sign. The trial court made a credibility determination that rejected Mrs. Rao’s claim. The court of appeal found no abuse of discretion in this ruling.
However, the Rao court also noted that the record showed that the stock certificate at issue evidencing ownership of 50 shares of common stock in the surgery center was issued in Dr. Rao’s name only. Hence, Dr. Rao had the right to execute both the original Stockholder’s Agreement and |1f¡the Amended Stockholder’s agreement, thereby subjecting the stock to the terms of the transfer restrictions and the stipulated, stock value -even without Mrs. Rao’s signature to the agreement. Citing *940 La. C.C. art. 2351 and its comments, the court stated that “[s]hares of stock issued in the name of a spouse are subject to management by that spouse exclusively.” Rao, supra at 366,.
This rule was also recently applied in Baumbouree v. Baumbouree, 2015-1053 (La.App. 3 Cir. 7/13/16), 202 So.3d 1077, writ denied, 2016-1557 (La. 11/18/16), 210 So.3d 286, 2016 WL 7030773. Sharon Baumbouree appealed a partial summary judgment in favor of her former husband which held that the value per share of the Hamilton Medical Group (“HMG”) was $1000 per share as provided in the shareholder’s agreement for purposes of the value to be used in their community property partition proceeding. Dr. Baumbour-ee, a pediatrician, purchased one share of stock of HMG, a physician-owned medical group, in his name only for $1000 during his marriage to Sharon. He signed the Stockholder Agreement and accompanying Shareholder Agreement that stipulated the value of stock at $1000 under all circumstances requiring sale or redemption. Sharon refused to sign the Stockholder and Shareholder Agreements. Following divorce proceedings, Dr. Baumbouree filed a motion for partial summary judgment requesting the trial court set the value of the HMG stock at $1000 per share as required by the shareholder agreement for purposes of the partition proceedings. Sharon opposed the motion alleging, inter alia, that she was not bound by the agreements that she had refused to sign.
Following a contradictory hearing, the trial court granted Dr. Baumbouree’s motion for partial summary judgment and designated the | ^judgment as final for purposes of immediate appeal. The court of appeal affirmed the trial court’s judgment. Quoting from its earlier opinion in Succession of Moss, 00-62 (La.App. 3 Cir. 6/21/00), 769 So.2d 614, writ denied, 00-2834 (La. 12/8/00), 776 So.2d 462, the court noted that “[although either spouse acting alone may manage, control or dispose of community property” pursuant to La. C.C. art. 2346, this right is tempered with respect to certain property. “Each spouse has exclusive right to manage or encumber movables issued or registered in his or her name,” citing La. C.C. art. 2351. Hence, “stock issued in the name of a spouse is subject to management by that spouse exclusively.” Succession of Moss, 769 So.2d at 620. We note that the panel in Moss concluded that Mrs. Moss’s ownership interest in the stock (issued to her deceased husband) did not give her autonomous control over the stock; rather, her interest is subject to the transfer at death restriction in the Articles of Incorporation.
The Baumbouree panel also discussed Rao v. Rao, supra, and concluded that the salient facts presented were indistinguishable from those in Rao—“in both instances, a non-employee spouse is attempting to avoid being bound, in the context of a community property partition, by a stock valuation agreed to by her physician/shareholder ex-spouse with regard to stock in a medical corporation owned by him and other physician stockholders.” Baumbouree at 1084. The court held that the fact that Sharon did not sign the Shareholder Agreement did not prevent application of the stock valuation contained therein, and accordingly, the partial summary judgment was properly granted.
Likewise, we find no distinction in the salient facts of Rao, supra, and Baumbouree, supra, with those presented in this case regarding the valuation |18Brian’s stock in the Orthopaedic Clinic. According to the rationale and legal authority applied in those cases, Brian had legal authority to execute the Shareholder Agreement. According to the law and authorities cited, that agreement is binding on Brian and *941 Lydia and dictates the valuation in the event of divorce. Accordingly, we conclude that the trial court did not err in its valuation of the Orthopaedic Clinic. This assignment is without merit.
By her fourth assignment of error, Lydia alleges that the trial court committed manifest error when it classified the post-divorce petition distributions from ASC as Brian’s separate property. During the 22-month post-petition period until the partition judgment, Brian received $543,755 in disbursements or distributions from ASC. Lydia claims the distributions are “civil fruits” and, therefore, community property subject to the partition. The trial court identified the distribution issue as “whether those payments are post-petition income earned through Brian’s effort, skill and industry, or some form of disbursement arising from his equity interest such that those monies should be classified as community funds and included in the partition.” It concluded that the disbursements made to Brian were compensation for his work done post-petition, and therefore, they were properly excluded from consideration as part of the patrimony to be partitioned. For the following reasons, we disagree with the trial court’s conclusion.
We begin by noting that there is no dispute that the ownership interests in ASC and the Orthopaedic Clinic are community property and neither party disputes the trial court’s classification of them as such. Community property includes, inter alia, property acquired during the existence of the legal regime through the effort, skill or industry of either |iaspouse; property acquired with community things and also includes the natural and civil fruits of community property. La. C.C. art. 2338. Pending partition of the former community property after the community is terminated, “each spouse owns an undivided one-half interest in the former community property and its fruits and products.” La. C.C. arts. 2369.1 and 2369.2. By negative implication to La. C.C. art. 2338, property acquired through the effort, skill or industry of either spouse after the legal regime is terminated is classified as separate property. Hence the trial court correctly identified the central question as whether the distributions Brian received during the post-petition period until the partition judgment are “civil fruits” of the former community ownership interest in ASC, or a product of Brian’s effort, skill, and industry.
La. C.C. art. 551 defines fruits as things produced by or derived from another thing without diminution of its substance. There are two kinds of fruits: natural and civil. Id. Civil fruits are revenues derived from a thing by operation of law or a juridical act such as rentals, interest, and certain corporate distributions. Id.
We also determine that because Brian received the distributions after termination of the legal regime, the distributions are presumed to be his separate property. Therefore, Lydia had the burden of proof at trial to establish that the post-petition distributions were civil fruits of her undivided co-ownership interest (former community interest) and not the product of Brian’s skill, efforts and industry. Statham v. Statham, supra at 898; see also, Ross v. Ross, 2002-2984 (La. 10/21/03), 857 So.2d 384. The Supreme Court explained allocation of the burden of proof in Lanza v. Lanza, 2004-1314 (La. 3/2/05), 898 So.2d 280. Lanza, like the Ross decision, Lnalso involved insurance commissions received by the husband during and after the termination of the community regime. Comparing the burden of proof allocation in the two cases, the court said:
Regarding the applicable burden of proof, in Ross, this Court held that, because the renewal commissions were re *942 ceived during the existence of the community, the burden of proof was on the husband to prove that the commissions were not community. Ross, supra at 396,. This is because property which comes into the possession of a spouse during the community regime is presumed to be community, regardless of the source. La. C.C. art. 2340; Talbot v. Talbot, 03-0814 (La. 12/12/03), 864 So.2d 590, 597.
However, in this case, there is no presumption of community as to these renewal commissions because the income at issue did not come into Mr. Lanza’s possession during the community regime. La. C.C. art. 2340. While Ms. Coudrain’s argument that a portion of this income was for work done during the existence of the community and thus constitutes “property acquired” during the community under La. C.C. art. 2338, the presumption of community found in La. C.C. art. 2340 applies only to “[t]hings in the possession of a spouse during the existence of community of acquets and gains ...” Therefore, Ms. Coundrain will have the burden of proving, by a preponderance of the evidence, which portion Mr. Lanza’s post-community income resulted from policies initially issued during the community, and of those policies, how much of the resulting service compensation was due to Mr. Lanza’s effort, skill, or industry exerted during the community.
Lanza v. Lanza, supra at 290-91,.
As we noted earlier, the non-physician member, Surge Center, also receives distributions based on its 30% 'ownership. Revenues are obtained by ASC by billing patients separately for the facilities and certain procedures provided by ASC, while the surgeon members, including Brian, receive compensation for his surgical procedures through the Orthopedic Clinic.
Although the ownership interest of each physician was calculated proportionate to the case volume of that physician, the actual distributions are based on the ownership percentages. Hypothetically, Dr. Bulloch would still receive distributions as long as he is a partner of ASC, irrespective of whether he performed surgeries; however, to remain a partner, the operating 1gl agreement of ASC requires that a member be a participating partner, i.e., perform a certain percentage of his surgeries or procedures at ASC. So, if he failed to perform any surgeries, he would be subject to being kicked out as a participating member of ASC. Additionally, the federal Safe Harbor Act requires that Dr. Bulloch perform a certain percentage of his surgeries at the ASC to be a participating member.
Brian and his expert, Mr. Clark, both testified that Brian’s distributions from ASC are the result of his effort, skill and industry as a practicing orthopedic surgeon. He testified that without his effort, skill and work as an orthopedic surgeon, he would receive no income. He states that if he did not work and produce income for ASC, he would be voted out or “disassociated.”
He asserts that the safe harbor provisions for ambulatory surgery centers require that the physician owners must be physicians for whom the surgery center is an extension of the medical practice. According to Medicare reimbursement rules, at least one-third of each physician member’s income from all sources for the previous fiscal year must be derived from the physician’s performance of procedures that require a hospital surgery setting or ASC-type setting, and one-third of these procedures must be performed at ASC. Brian performs the majority of his procedures at ASC and argues that he is an owner-physician who refers his patients to ASC *943 and performs procedures for his patients there. He says that ASC is an extension of his medical practice as it is for the other owner physicians.
Mr. Clark testified that Brian’s ownership in ASC was predicated on his professional skill as an orthopedic surgeon. Without such skill, he could | ai>not be an owner. Since he is required to perform work at ASC, it is an extension of his medical practice and any income would be from his effort, skill and industry, Mr. Clark admitted on cross-examination, however, that if the distributions were based solely on the effort, skill and industry of each physician, Brian would have received 6.7% of the gross receipts for the period because that was the percentage directly attributable to his referrals instead of the 5.1% he was entitled to under his ownership interest.
We conclude that the distributions from ASC should be classified as the civil fruits of the former community interest in ASC. The evidence establishes that Brian is compensated by the Orthopaedic Clinic for the surgical procedures he performs at ASC, i.e., the procedures constituting his efforts, skill and industry as a surgeon. Presumably, he receives the same compensation for his skill and industry efforts for the surgical procedures he performs at other surgical facilities where he has no ownership interest, such as a local hospital.
The distributions Brian receives from ASC are based upon his percentage of ownership in ASC. The fact that he and the other physician members are required to bring or refer a significant portion of their practice to the clinic constitutes much of the personal goodwill valuation that was excluded in the valuation of the Lydia’s community interest in ASC,
Accordingly, we hold that Lydia is entitled to receive one-half of the $543,755 in distributions made from ASC to Brian during the post-termination period until the partition judgment.
By her fifth assignment of error, Lydia alleges that the trial court was manifestly erroneous and clearly wrong to award Brian reimbursement for payment of income and property taxes. This ássignment involves two tax 1 ^payments: (1) 2013 property taxes for which the court awarded Brian reimbursement of $1,809, and (2) 2014 payment for 2013 income taxes in the amount of $32,500 for which Brian was awarded a reimbursement of $16,500.
Brian conceded at trial that the payment for the 2013 property taxes was made with community funds and conceded that he was not entitled to the award. Consequently, the trial court erred in making this award. We therefore reverse the $1,809 award for property taxes he paid on the former matrimonial domicile on December 31, 2013. Accordingly, the court will adjust the partition to delete this award.
The $16,500 award for reimbursement to Brian for two income tax payments ($32,-500 for income federal tax and $500 for state income tax payment) is still contested. Additionally, Lydia contends that the payment in dispute is only the $32,500 federal income tax payment, but we glean from the exhibit of record that the trial court apparently included the additional $500 payment to the Louisiana Department of Revenue. Lydia argues that the award should have been $16,250 rather than $16,500.
Lydia maintains that the funds Brian used were community funds consisting of BP settlement money and a bonus check that were deposited in his Progressive Bank account. Brian concedes that the BP check was community funds and one-half of five-sixths of the bonus check was community. He opened the Progressive ac *944 count after the divorce petition was filed and deposited the above community funds. He also deposited subsequent funds from earnings of his medical practice, including disbursements from ASC and the Ortho-paedic Clinic. He testified that this was his only bank account after the petition was filed. He therefore admits l^that some of the deposits were community funds, but claims that the community funds were accounted for and not used to pay the taxes. Lydia maintains that Brian has not submitted proof that he made the payment with separate funds, and therefore, the court was clearly wrong in awarding the reimbursement.
When separate and community funds are deposited into one bank account, this fact does not convert the entire account into community property. “Only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all of the funds characterized as community funds.” Fulco v. Fulco, 50,256 (La. App. 2 Cir. 11/18/15), 183 So.3d 573; citing Curtis v. Curtis, 403 So.2d 56 (La. 1981). If separate property of a spouse has been used either during the existence of the community or thereafter to satisfy a community obligation, that spouse is entitled to reimbursement for one-half of the amount or value the property had at the time it was used. La. C.C. art. 2365; Bodenheimer v. Freitag, 94-2573 (La. 1/6/95), 651 So.2d 251. The burden of proof is on the party claiming reimbursement to show that separate funds existed and were used to satisfy the community obligation. Tippen v. Carroll, 47,415 (La.App. 2 Cir. 9/20/12), 105 So.3d 100. Where separate funds can be traced with sufficient certainty to establish the separate ownership of the property paid for with those funds, the separate status of such property will be upheld. Curtis v. Curtis, supra.
In Fulco v. Fulco, supra, we held that the trial court did not err when it awarded the wife reimbursement of $22,248.41, where the wife showed through her bank account that she paid numerous community debts, |2fiincluding paying off the house and an SUV and other community debts around the time she received a large infusion of cash that was her separate property-
In this instance, the record is not particularly helpful. Brian testified regarding the monies deposited in his checking account and said that he paid the income tax in 2014 with his separate funds. The trial court obviously believed that Brian’s testimony or bank statements established that the income tax was paid with separate funds. We find no manifest error in this award.
By her sixth assignment of error, Lydia contends that the trial court committed manifest error in its valuation of the former matrimonial domicile. The trial court valued the home at $556,000 by averaging three appraisals of the home. Lydia contends that one of the appraisals used by the court was defective and its inclusion in the calculation inflated the value of the home to her detriment. We agree.
Lydia and Brian each submitted appraisals for the home of $545,000 and $550,000 respectively. Both of these appraisals included a home inspection by the respective appraisers. Brian also introduced a third, earlier appraisal of $574,000 that did not include a walk-through home inspection—only a drive-by of the residence. Had the court simply averaged the two home-inspection appraisals, the value of the home would be $547,500 instead of $556,000—a difference of $8,500.
*945 A “drive-by” appraisal simply establishes that the home being appraised is there. Market value is then determined by examining the records for sales, of other homes in the vicinity. The interior condition of the home is not considered.
|2fiWe cannot find any reason for the trial court to include a drive-by appraisal in its determination of the value of the home. The two complete appraisals submitted by the parties included home inspections, and therefore should be presumed to reflect the most accurate valuations. Both appraisals reached a similar conclusion as to the market value of the home. On the other hand, the third, drive-by appraisal was considerably higher than the detailed inspections. By including the drive-by appraisal in its valuation, the court inflated the value of the home. Accordingly, we conclude that the trial court erred by including the drive-by appraisal in its calculation, and we conclude that the value of the former matrimonial domicile is $547,500.
CONCLUSION
For the reasons stated above, we affirm the trial court’s judgment and findings awarding Brian rental value of the former matrimonial domicile, the court’s valuation of Advanced Surgery Center and the Or-thopaedic Clinic, and reimbursement for 2013 income taxes. We reverse the reimbursement award against Lydia for $1,809 in property taxes. The trial court’s judgment that the ASC distributions are Brian’s separate property is reversed. Accordingly, Lydia is entitled to one-half of the post-termination distributions made by ASC to Brian. Additionally, we amend the appraisal valuation of the former family home by the trial and set the value of the former matrimonial domicile at $547,500. In all other respects, the trial court judgment is affirmed. Costs are to be paid one-half by each party.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART; AFFIRMED AS AMENDED.

. For additional discussion, see Gill v. Gill, 39,406 (La.App. 2 Cir. 3/9/05), 895 So.2d 807; Ball v. Ball, 32,851 (La.App. 2 Cir. 3/1/00), 757 So.2d 824; Moore v. Moore, 2005-0290 (La.App. 3 Cir. 11/2/05), 917 So.2d 1126.