# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 22-741


NOEL W. YATES

VERSUS

LISA J. YATES


**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 98,623
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Sharon Darville Wilson, Judges.


AFFIRMED IN PART AS AMENDED;
REVERSED IN PART; AND REMANDED.

**Elvin C. Fontenot, Jr.**
**Attorney at Law**
**110 East Texas Street**
**Leesville, LA 71446**
**(337) 239-2684**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Noel W. Yates**

**E. Grey Burnes Talley**
**Talley & Talley LLP**
**711 Washington Street**
**Alexandria, LA 71301**
**(318) 442-5231**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Lisa J. Yates**

**GREMILLION, Judge.**

Lisa J. Yates appeals the trial court's judgment that partitioned the community property existing between her and her former spouse, Noel W. Yates. For the following reasons, we affirm in part as amended, reverse in part, and remand with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

Lisa and Noel married in June 1989, and separated in early July 2019. Noel filed a Petition for Divorce Pursuant to La.Civ.Code art. 102 on February 27, 2020. On February 24, 2021, Noel filed a "Rule to Show Cause for Separation of Property Pursuant to La. Civ. C. Art. 2374(C)." On that same day, he filed a second supplemental and amending petition seeking the eviction of Lisa from the family home and granting him exclusive use if he was appointed domiciliary parent. Alternatively, Noel sought "reimbursement from defendant for the rental value associated with defendant's exclusive use and occupancy of the residence."

On April 19, 2021, Noel filed a motion for judgment of final divorce and fault hearing. Following a May 20, 2021 hearing, the trial court granted a Judgment of Divorce that was signed on June 23, 2021. The Judgment of Divorce terminated the community property regime retroactive to February 27, 2020. The judgment ordered that all other orders would be unaffected, and Noel was to continue paying the monthly amount for "household expenses and maintenance." Following a May 25, 2021 hearing, a judgment rendered on July 14, 2021, awarded Lisa use of the former matrimonial home and "interim spousal support in the amount of $900.00, per month, beginning March 17, 2020, which shall terminate on May 31, 2021." It denied Lisa's request for permanent periodic support and deferred Noel's request for rental reimbursement to the partition of the community property along with both parties' requests for attorney fees.

Noel filed a Petition for Judicial Partition of Community Property on August 3, 2021. He filed his first sworn detailed descriptive list on September 14, 2021.[1] Lisa filed her first sworn detailed descriptive list on November 10, 2021. Noel filed a motion for a court-appointed appraiser on December 17, 2021. On January 24, 2022, Noel filed an amended sworn detailed descriptive list of community property.[2] On February 24, 2022, the trial court signed an order ordering Lisa and Noel each to pay one-half of the $500.00 for the appraisal prepared by Charest Thibodeaux. Lisa filed her traversal on March 31, 2022. Noel filed an amended sworn detailed descriptive list of community property on May 17, 2022.[3] A

---

[1] Noel's claims for reimbursement were:

| | | |
|---|---|---|
| 1. | Home insurance premiums | Included in the mortgage |
| 2. | Property taxes on home | 1748.00 |
| 3. | 2019 Federal and state income taxes | 820.00 |
| 4. | Deposit made to joint bank account since separation | $36,277.00 |
| 5. | Health, vision and dental insurance | $12,920.08 |
| 6. | Rental Reimbursement | $13,500.00 |
| | Total Payments by Noel W. Yates | $65,265.08 |
| | 2. LESS: One-half | $32,632.54 |
| | **TOTAL CLAIM FOR REIMBURSEMENT** | **$32,632.54** |

[2] Noel's claims for reimbursement were:

| | | |
|---|---|---|
| 1. | Rental reimbursement on barn for horse stabling | $TBD |
| 2. | Home insurance premiums | Included in the mortgage |
| 3. | Property taxes on home | 2607.34 |
| 4. | 2019 Federal and state income taxes | 820.00 |
| 5. | Deposit made to joint bank account since separation | $36,277.00 |
| 6. | Health, vision and dental insurance | $12,920.08 |
| 7. | Rental reimbursement | $41,400.00 |
| 8. | Personal Items destroyed by fire | 2,500.00 |
| 9. | VPSO Items destroyed by fire | 500.00 |
| 10. | House note to Rocket Mortgage | 5,800.00 |
| 11. | Yates Estate | TBD.00 |
| | Total Payments by Noel W. Yates | $101,954.08 |
| | 2. LESS: One-half | $50,982.54 |
| | **TOTAL CLAIM FOR REIMBURSEMENT** | **$50,982.54** |

[3] Noel's claims for reimbursement were:

| | | |
|---|---|---|
| 1. | Rental reimbursement on barn for horse stabling | $10,200.00 |
| 2. | Home insurance premiums (Included in the mortgage) | TBD.00 |
| 3. | Property taxes on home | 2607.34 |
| 4. | 2019 Federal and state income taxes | 820.00 |
| 5. | Deposit made to joint bank account since separation | $36,277.00 |
| 6. | Health, vision and dental insurance | $12,920.08 |
| 7. | Rental reimbursement | $41,400.00 |
| 8. | Personal Items destroyed by fire | 2,500.00 |
| 9. | VPSO Items destroyed by fire | 500.00 |
| 10. | House note to Rocket Mortgage | 7975.00 |

partition hearing was held on May 24, 2022. The trial court rendered its oral ruling on the partition at a hearing on June 1, 2022.[4] A judgment of partition was signed on July 13, 2022.[5] Lisa timely appealed.[6] [7] [8]

## ASSIGNMENTS OF ERROR

Lisa assigns as error:

1. It was error for the Trial Court to find the Barksdale checking and savings accounts in Noel's name were his separate property.

| | |
|---|---|
| 11. Yates Estate | TBD.00 |
| 12. Withdrawal from Northern Trust Company (separate funds of Noel to contribute to building of new home) | $16,510.57 |
| Total Payments by Noel W. Yates | $131,709.99 |
| 2. LESS: One-half | $65,855.00 |
| **TOTAL CLAIM FOR REIMBURSEMENT** | **$65,855.00** |

[4] At the beginning of the hearing, the trial court stated that all objections would be deferred to the end. At the conclusion, Lisa objected as follows:

> Okay, for the record, I need to voice an objection to the award of rental, or stabling fees. And, then an objection to all of the reimbursement claims of Noel Yates, which were not proven by anything other than his testimony. You know, if he just stated what it was, and didn't have a receipt or a canceled check or anything of that nature.

[5] The trial court's judgment regarding Noel's reimbursements states:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that NOEL W. YATES shall receive the total of $158,298.82 as reimbursements, to wit:
>
> 1. $2,030.02 for payment on children's insurance premiums;
> 2. $15,500.00 for attorney fees;
> 3. $250.00 for appraisal;
> 4. $77.00 for transcript;
> 5. $12920.08 for health and vision insurance premiums;
> 6. $7,975.00 for payments to Rocket Mortgage;
> 7. $41,400.00 for rental reimbursement;
> 8. $2,607.34 for payment of property taxes;
> 9. $39,262.38 for Yates estate; and
> 10. $36,277.00 for payments into joint account.

[6] We note that Lisa's brief exceeds the page limit and does not address the assignments of error set forth in sections or any other cohesive manner. Instead, it is just one long document with no headings or delineation between assignments.

[7] We additionally note that Noel's six-page brief states: "Appellee has attempted to coordinate the exhibits filed by parties with the testimony on the subject matters at issue; however, the original exhibits were transferred to the Third Circuit Court of Appeal and were not available for my review and to insure the accuracy of the exhibits correspond to specific testimony."

[8] According to Lisa's counsel, the judgment was prepared by Noel's counsel. Lisa's counsel requested additional time to review the judgment because she had to attend an out-of-state funeral, but the request was denied.

2. It was error for the Trial Court to award Noel half of Lisa's MidAmerica Premium retirement, while awarding Noel all of his Social Security retirement and Lisa all of hers.

3. It was error for the Trial Court to find the alleged $2,000.00 Schamerhorn bill to be a community debt without any corroborating/documentary or testimonial evidence whatsoever.

4. It was error for the Trial Court to sign a <u>Judgment</u> which does not conform to its ruling.

5. It was error for the Trial Court to grant Noel a reimbursement claim for payments on the children's insurance premiums.

6. It was error for the Trial Court to grant Noel a reimbursement claim for $250.00 for the appraisal of the former matrimonial domicile, without granting Lisa the same.

7. It was error for the Trial Court to award Noel a reimbursement claim of $12,920.09 for payment of health and vision insurance, when it was ordered as spousal support.

8. It was error for the Trial Court to award Noel a reimbursement claim of $7,975.00 for payments to Rocket Mortgage when he did not prove he made payments in that amount.

9. It was error for the Trial Court to award Noel a reimbursement claim for rental of the former matrimonial domicile.

10. It was error for the Trial Court to award Noel a reimbursement claim for payment of property taxes without any documentary evidence (or even clear testimony) that he paid that amount of property taxes on the former matrimonial domicile.

11. It was error for the Trial Court to award Noel a reimbursement claim for the Yates estate.

12. It was error for the Trial Court to award Noel a reimbursement claim for deposits into the joint account.

When the parties cannot agree on a partition, La.R.S. 9:2801 sets forth the procedure a trial court must follow when partitioning the former spouses' property:

> A.     When the spouses are unable to agree on a partition of community property or on the settlement of the claims between the spouses arising either from the matrimonial regime, or from the co-ownership of former community property following termination of the matrimonial regime, either spouse, as an incident of the action that would result in a termination of the matrimonial regime or upon termination of the matrimonial regime or thereafter, may institute a proceeding, which shall be conducted in accordance with the following rules:

4

. . . .

(4) The court shall then partition the community in accordance with the following rules:

(a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.

(b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.

(c) The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.

(d) In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security.

(e) In the event that the allocation of an asset, in whole or in part, would be inequitable to a party, the court may order the parties to draw lots for the asset or may order the private sale of the asset on such terms and conditions as the court deems proper, including the minimum price, the terms of sale, the execution of realtor listing agreements, and the period of time during which the asset shall be offered for private sale.

(f) Only in the event that an asset cannot be allocated to a party, assigned by the drawing of lots, or sold at private sale, shall the court order a partition thereof by licitation. The court may fix the minimum bids and other terms and conditions upon which the property is offered at public sale. In the event of a partition by licitation, the court shall expressly state the reasons why the asset cannot be allocated, assigned by the drawing of lots, or sold at private sale.

B. Those provisions of a domestic relations order or other judgment which partitions retirement or other deferred work benefits between former spouses shall be considered interlocutory until the domestic relations order has been granted "qualified" status from the

plan administrator and/or until the judgment has been approved by the appropriate federal or state authority as being in compliance with applicable laws. Amendments to this interlocutory judgment to conform to the provisions of the plan shall be made with the consent of the parties or following a contradictory hearing by the court which granted the interlocutory judgment. The court issuing the domestic relations order or judgment shall maintain continuing jurisdiction over the subject matter and the parties until final resolution.

Louisiana Civil Code Article 2338 defines community property:

The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.

Appellate review of a trial court's factual determinations relating to the partition of community property is as follows:

The trial court's findings of fact are subject to the manifest error/clearly wrong standard of review. *David* [*v. David*, 12-1051, (La.App. 3 Cir. 4/10/13],117 So.3d 148, [*writ denied*, 131541 (La. 10/4/13), 122 So.3d 1023]. However, the trial court is accorded broad discretion in resolving community property disputes. *Williams v. Williams*, 07-541 (La.App. 3 Cir. 10/31/07), 968 So.2d 1234.

*Keenan v. Keenan*, 15-828 p. 5 (La.App. 3 Cir. 2/3/16), 186 So.3d 289, 295–96, *writ denied*, 16-418 (La. 4/15/16), 191 So.3d 590. Legal errors are always reviewed de novo. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). "[A]n appeal lies from the judgment itself, not the reasons for judgment." La.Code Civ.P. art. 2083; *Bezou v. Bezou*, 15-1879 (La.App. 1 Cir. 9/16/16), 203 So.3d 488, *writ denied*, 16-1869 (La. 12/5/16), 210 So.3d 814. "Where the trial court's reasons for judgment are flawed, but the judgment is correct, the judgment controls. Reasons for judgment set forth the basis for the court's holding and are not binding." *Id*. at 498 (citing *Premier Games, Inc. v. State, Dep't of Pub. Safety & Corr., Video Gaming Div.*, 99-624 (La.App. 1 Cir. 5/12/00), 761 So.2d 707).

## Assignment of Error One/Community Property Checking and Savings Accounts

In this assignment, Lisa argues that the trial court erred in finding that the Barksdale checking and savings accounts were Noel's separate property because they were established during the marriage and are subject to the presumption that they were community property, and the deposit of separate funds into the accounts did not convert them into separate property.

> When separate and community funds are deposited into one bank account, this fact does not convert the entire account into community property. "Only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all of the funds characterized as community funds." *Fulco v. Fulco*, 50,256 (La.App. 2 Cir. 11/18/15), 183 So.3d 573; *citing Curtis v. Curtis*, 403 So.2d 56 (La. 1981).

*Bulloch v. Bulloch*, 51,146, p. 24 (La.App. 2 Cir. 1/18/17), 214 So.3d 930, 944, *writ denied*, 17-348 (La. 4/13/17), 218 So.3d 629.

Noel's own testimony proves that the checking and savings accounts contained community funds before he comingled his separate funds from his inheritance into the accounts. Noel testified the accounts were established during the marriage and had community funds in them before he deposited inheritance funds. Noel said (emphasis added):

> Q. Okay. So really your - - the assets in your possession, the [incorporeal] assets in your possession *should have this $1,480.01, that was already in the checking account. And, it should also have the $3,405.26, that was already in your savings account.*
>
> A. *Correct.*

The trial court's judgment does not mention ownership of the two accounts. But at the June 1, 2022 hearing, the following exchange occurred:

> MRS. TALLEY:
>
> I think that is correct, Judge. There is something that has came [sic] up with regard of [sic] reimbursement claims. And that is Noel

Yates has an account with Barskdale that he used checks from, and then – but he had not listed it. So, he did give testimony about – about the existence of that account at the time he filed his petition.

BY THE COURT:

Right.

MRS. TALLEY:

And, in the record there is a statement that includes the balance on the date that he filed the petition.

BY THE COURT:

Right.

MRS. TALLEY:

So, you'll be awarding that to Noel Yates at whatever – whatever the value was on November, I mean, February 27, 2020?

BY THE COURT:

Correct, but that's going to be his separate property. I think testimony was that was from his dad's estate, you know.

MR. FONTENOT:

Correct.

MRS. TALLEY:

Well, but, Judge, it did – it did have that in there, but number one, he's made a reimbursement claim. And that's his dad's separate property, and it went into a separate account. So, how can he make a reimbursement claim for it, if it never touched community. And, secondly, there was other money in there, and he testified that there was several thousand dollars in both the checking and savings and it's on some of the exhibits that we had.

[MR. FONTENOT]

Well, I thought you were ruling on the case. I'm not prepared to add or refute anything you said, because I thought all the evidence was in. So, I don't know what Ms. Talley is referring to, but I thought we went through all of that when we were here the other day, so –

BY THE COURT:

So, I'm going to find, just for the record, that is Mr. Yates's separate property. There was some testimony, "Well, did you put a check in there". I think was about the only thing was, and I think he said "yes", actually to that. But, there was never a value established as to what check was put in there, and how much was in there. I think the clear majority from the testimony, because there was evidence indicated that this was from this source from an Edward Jones or from a life insurance. I think maybe even a burial policy was put in there from his dad, if my memory was correct. So, of course, in the community debt part of it, of course, Mr. Yates is going to have to, and we'll get to that in a second, but while I'm off track here, might as well, of course, the value of the – appraised value of the home and the acreage there was $590,000.00[.]

We find the trial court manifestly erred in determining that the Barksdale checking and savings account were Noel's separate property without taking into account the funds existing when the community was still intact. Noel clearly testified that the funds in the account were community property prior to the deposit of the funds he received as part of his inheritance. Noel admits same in brief:

> It is undisputed that the checking account had a balance of $1,480.00 before the Columbia Financial Check, which were proceeds from his deceased father in the amount of $7,267.94, was deposited. The savings account already had a community funds balance of $3,405.26 when the Edward D. Jones check, which he inherited from his father in the amount of $8,701.00, was deposited. Appellee has no dispute with the fact that those two accounts were community accounts. The court did rule that those accounts were Noel's separate property. Appellee does not believe that that is what the court intended but intended that the proceeds deposited in those accounts be recognized as being Noel's separate property. However, all of this was rectified by the Trial Court later on when the court recognized that the funds, although deposited in a community account were not so comingled with the community funds in that account to destroy the separate nature of those funds. Also, later on the court ruled that Noel Yates was entitled to one-half the proceeds from that money as a reimbursement claim when those funds were used to make improvements to the barn and apartment to house Noel's father before he died.

Lisa does not dispute the fact that the two deposits from Noel's inheritance were his separate property. Nevertheless, the existing community funds prior to the two inheritance deposits were community funds that were not properly

allocated between the parties under community assets.[9]  Thus, Lisa is entitled to reimbursement for one-half of the community funds existing at that time which amounts to $2,442.63.

## Assignment of Error Two/Retirement Accounts

Lisa argues the trial court erred because it did not treat her MidAmerica retirement account like a federal Social Security account because it is a Social Security alternative.  Lisa's argument on appeal relating to the MidAmerica account is reprinted in its entirety (footnote omitted):

> It guarantees an interest rate.  This feature shows it is a defined contribution retirement plan, not subject to division by *Sims*.
>
> Since this is a Social Security alternative account, it and Lisa's Social Security earned before her present employment should be treated the same.  If Noel gets all of his Social Security account, Lisa should have received all of her Social Security and Social Security alternative accounts.

We note that Lisa provides no law in support of her claim that a retirement program that is a Social Security alternative should be treated the same as a federal Social Security account.  We further find no support for this claim.  In *Blanchard v. Blanchard*, 96-1031 (La.App. 5 Cir. 5/28/97), 697 So.2d 275, *aff'd*, 97-2305 (La. 1/20/99), 731 So.2d 175, the appellate court undertook an in-depth analysis of the various means of partitioning retirement/pension plans including *T.L. James & Co., v. Montgomery*, 332 So.2d 834 (La.1976) (matured defined contribution plan–determined based on the contributions the employee made during the community), *Sims v. Sims*, 358 So.2d 919 (La.1978) (defined benefit plan–divided the amount of time in the plan during the community by the total number of work years to determine a percentage earned during the community), and *Hare v. Hodges*, 586 So.2d 118 (La.1991) (*Sims* is not exclusive means of apportioning

---

[9] We note that this account remained a community account until the partition judgment was rendered as will be discussed more fully in assignment of error twelve.

retirement benefits–present value method can be applicable in some circumstances).

The *Blanchard* court noted there are many factors in determining whether to award a present-day value of the retirement plan or a deferred interest, emphasizing the trial court's discretion in analyzing the particular facts of the case:

> Thus, under La. R.S. 9:2801 and the variations added to the *Sims* approach by *Hare*, the trial court, in considering a community property partition involving pension rights, *has the discretion to make an equitable determination on a case by case basis, provided that each spouse receives property of an equal net value, considering the nature and source of the asset.* La. R.S. 9:2801(4)(b) & (c). In other words, the *Sims* fixed percentage formula is no longer the only acceptable method for apportioning pension rights between spouses. In the appropriate case, where the calculation of the present value of benefits is not too speculative, where the pension rights can be valued accurately and where the marital estate includes sufficient equivalent property to satisfy the claim of the non-employee spouse without undue hardship to the employee spouse, the present value method could be used.

*Blanchard*, 697 So.2d at 278–79 (emphasis added).

The trial court did not address Social Security benefits in the judgment, nor specifically at the partition hearing, but did state the following at the June 1, 2022 hearing: "And Social Security Retirement, each are going to be entitled to their own Social Security[.]" It is unknown what that value is for Noel. Lisa, on the other hand, submitted her Social Security statement into evidence which shows a payment of $965.00 if she were to retire at age sixty-five.[10] Relating to retirement accounts, the trial court's judgment awarded Lisa:

---

[10] We note that the trial court can consider the value of Social Security benefits in apportioning community property but did not do so here. Louisiana Revised Statutes 9:2801.1 provides:

> When federal law or the provisions of a statutory pension or retirement plan, state or federal, preempt or preclude community classification of property that would have been classified as community property under the principles of the Civil Code, the spouse of the person entitled to such property shall be allocated or assigned the ownership of community property equal in value to such property prior to the division of the rest of the community property. Nevertheless, if such property consists of a spouse's right to receive social security benefits or the benefits themselves, then the court in its discretion may allocate or assign other community property equal in value to the other spouse.

11

"81. One-Half of MidAmerica Premier Plan Social Security Alternative Retirement Plan (also known as FICA alternative plan, defined contribution retirement plan) in the name of Lisa Yates, account type 31 21 [sic] 457(b)[1.];

Lisa was also awarded the:

77. Edward Jones I.R.A. account in the name of Noel Yates ending #9811 [$726.00.]

It awarded Noel:

"3. One-Half of MidAmerica Premier [Plan] Social Security Alternative Retirement Plan (also known as 3121 FICA alternative plan, defined contribution retirement plan) in the name of Lisa Yates, account type 31 21 [sic] 457(b).

The trial court ordered that the retirement/pension accounts of Noel with Schlumberger and the Vernon Parish Sheriff's Office shall be divided by Qualified Domestic Relations Order (QDRO).

The trial court, in an exchange with Lisa, referred to the MidAmerica plan as a defined contribution plan after discussing the differences between defined benefit and defined contribution plans. He noted regarding Noel's Vernon Parish retirement plan and Lisa's MidAmerica plan, "The moneyappears [sic] from my testimony would be about the same."

Noel argues the MidAmerica plan is a defined contribution retirement plan, for which the *Sims* formula was intended to partition the parties' interests. We agree. Although not discussed by the trial court, one hundred percent of Lisa's MidAmerica retirement plan was earned during the existence of the community. Noel's Vernon Parish retirement was approximately $70,000.00 while Lisa's MidAmerica was around $62,000.00 at the time of the partition trial. To classify the MidAmerica account in the same way a federal Social Security account is treated would result in an inequitable distribution of the community-earned retirement funds. The trial court allowed each party to keep their Social Security

12

benefits and split the remaining retirement accounts in an equitable fashion. We find no error in the trial court's allocation of one-half of the MidAmerica account to each spouse. This assignment of error is without merit.

**Assignment of Error Three/Community Debt**

In this assignment of error, Lisa argues the trial court erred in finding that the community owed Chris Schamerhorn $2,000.00 "without any corroborating/documentary or testimonial evidence whatsoever." In her brief, Lisa states (footnote omitted):

> The Trial Court found it to be a community debt and awarded it to Noel. This claim should be denied.
>
> The Trial Court's Judgment did not assign the Schamerhorn debt to anyone. But undersigned counsel felt it should be addressed, if only as an explanation of the deviation between the ruling and the Judgment.

Noel's second and third Amended Sworn Detailed Descriptive List of Community Property listed the $2,000.00 debt to Chris Schamerhorn under "Community Property Liabilities." Noel testified: "We owe Chris Schamerhorn $2,000.00 for work done in January - - December of 19. We've never paid him." Additionally, the following testimony was elicited from Noel at the trial on cross-examination:

Q. . . . . And tell me again Chris Schamerhorn, what did he do?

A. We purchased rick [sic] for the driveway, the house and the barn.

Q. Okay. Let me come up there so I can hear what you're saying. Okay you purchased –

A. Loads of rocks –

Q. Okay.

A. Driveway covering for the driveway to the house and to the barn.

Q. Okay. And when did y'all buy that?

A. It was in late 2019.

Q. It was delivered at that time?

A. Yes, ma'am.

Q. Okay. And how was he paid?

A. He wasn't.

Q. He wasn't paid? You still owe that?

A. Yes, ma'am.

Noel testified that Schamerhorn was owed $2,000.00 for the payment of rocks used at the residence. Lisa was not questioned about the rock purchase. The trial court found Noel's testimony credible regarding the debt incurred for rocks, and we cannot say it erred as there was no testimony to suggest otherwise. In this regard, Lisa's assignment of error is without merit. Although not mentioned in the judgment, the trial court did orally state it was a community debt and assigned the debt to Noel at the partition hearing[11] While we normally would not address matters not included in the trial court's judgment, we will do so here to prevent any further errors on remand. Accordingly, because there was no manifest error in the trial court's finding that this was a community debt, the judgment is amended to include the $2,000.00 community debt assigned to Noel.

## Assignment of Error Four/Non-Conforming Judgment

In this assignment, Lisa argues the trial court erred in signing a judgment that does not conform to its ruling. Although it is difficult to discern from the brief since Lisa did not use a traditional brief format but instead discussed the issues under the headings of assets/liabilities/reimbursement, this assignment seems to encompasses a number of claims spread throughout the brief. Most of these claims are related to mathematical errors. We will address the non-reimbursement-related

---

[11] The only community debts referenced in the judgment are assigned to Lisa and include balances on a credit card and Lisa's car note.

14

claim (appraisal value of the home) and the mathematical-error reimbursement claims here. One claimed error relating to reimbursement of court costs will be addressed in the subheading below.

*Matrimonial Home Appraisal Value*

Lisa claims:

1.The trial court erred in assessing the value of the former matrimonial home at $590,000 because "there is no evidence in the Record that the value of the **former matrimonial domicile** (IP-1) is anything other than the $606,530.00 shown on the appraisal entered into evidence." (footnote omitted.)

At the partition hearing, the trial court stated regarding the former matrimonial domicile: "[I]t's been established at $590,000.00 by Mr. Charest Thibodeaux. That's just a feedback from that there. And, so, that's going to be the value." Likewise, the trial court's judgment established the value at $590,000.00.

The documentary evidence in the record regarding valuation of the former matrimonial domicile includes Noel's Sworn Detailed Descriptive List listing the value at $590,000.00, NoelYates1, which is his preapproval letter from a credit union with a listed purchase price of $590,000.00, and Lisa's Traversal which lists the value at $590,000.00 in both the "his" and "her" columns. The other documentary evidence in the record is NoelYates 12-a Comparable Market Analysis offered by Vicki M. Perkins, a Century21 realtor, which valued the property at $606,530.00. Perkins also offered a rental value for the home that the trial court considered in assessing rental value. The following exchange regarding the home valuation occurred:

BY MRS. TALLEY:

Judge, the – one of the exhibits that Noel offered was something called a comparative – comparable market analysis. It is different than what we were given. One of these has a rental amount and other [sic] doesn't. What I don't know is if the one that was admitted into evidence has the fair market value of the house itself.

BY THE COURT:

It does.

BY MRS. TALLEY:

What does it show it to be?

BY THE COURT:

Pretty close to the appraisal acutally. I'm getting there. It's – wait the appraisal is $590,000.00 right?

BY MR. FONTENOT:

Yes.

BY MRS. TALLEY:

$590,00[0].00 is what Mr. Charest –

BY THE COURT:

$606,000.00

BY MRS.TALLEY:

$606,000.00?

BY THE COURT:

So, they were $16,000.00 off. Let the offering be received, the Rocket Mortgage.

There is no other documentary or testimonial evidence setting the value at $590,000.00, such as an appraisal from Thibodeaux or testimony from the appraiser. Nevertheless, Thibodeaux did indeed conduct an appraisal since Thibodeaux is referred to in the record several times even by Lisa. For example, she refers in brief to the appraisal fee charged by him in assignment of error six. Further, in her Traversal describing community property, her very first item is the "former matrimonial domicile on land more particularly described as [,] " listing Noel's appraisal value at $590,000.00 and *her* appraisal value at $590,000.00. Her

16

traversal comments state: "11/13/21 appraisal by George Thibodeaux[.]" Noel was even questioned about the appraisal by Lisa's attorney:

> Alright. Now, your attorney and I had a discussion with regard to Mr. Thibodeaux's appraisal, because Lisa had already hired him to do the appraisal, and he had already done the appraisal and was paid $500.00. And then there was an order signed by the Judge probably not knowing that we had already hired him and already had it done. But, for him to do it and take some more pictures. We discussed whether we will be able to discuss this with Mr. Thibodeaux and whatever he says is due that the two if [sic] you will pay half of all of it. Are you agreeable to that?

While it is certainly odd that the appraisal was not submitted into evidence, we find no manifest error in the valuation of the former matrimonial domicile at $590,000.00 based on the above. This assignment is without merit.

*Lisa's Reimbursement Claim for State Farm Premium Payments (Allegation of Mathematical Error)*

Lisa claims:

2. The amount awarded to Lisa for her State Farm premium payments in the ruling was the amount of the Traversal ($8,541.00) plus payments for April and May (about $900.00) for a total of $9,441.00. The judgment only awarded $9,224.26, which was $216.74 too little.

In the trial court's judgment, Lisa was awarded $9,224.26 in reimbursement for State Farm insurance premiums she paid with her separate funds. At the hearing of the court's ruling, the trial court stated Lisa would be entitled to "LR.4" and that all of those values are going to be found by the Court, and she be reimbursed." Exhibit LR.4 relating to the State Farm Insurance payments made by Lisa shows a total due of $11,369.00. However, her traversal lists $8,541.00 as the amount due through March 2022. In a footnote in her brief, Lisa states the insurance dollar amount comes from "Traversal . . . and regular payments out of Lisa's Capital One account (exhibit Lisa Capital One) (*about $450.00 / month x 2 months, for April and May*)(Emphasis added). The LR.4 exhibit lists varying amounts ranging from $415.00 to $475.00 monthly. Lisa points to nothing in the

17

record setting forth with specificity the amount of the April and May awards and in fact gives an estimate of "about $450.00 per month." Lisa cites "Exhibit Lisa Capital One," an exhibit of bank statements from February 2020 through April 2022. The April 2022 bank statement shows two withdrawals from Lisa's account by State Farm in the amount of $266.26 and $185.16 for a total of $451.42 ($8,541.00 + $451.42 = $8,992.42). Using Lisa's estimate of $450.00 for the May payment would result in a total reimbursement of $9,442.42. However, there is no proof in the record of that final payment. Accordingly, we are unable to find manifest error on the part of the trial court in awarding $9,224.26. This assignment is without merit.

*Lisa's Reimbursement Claim for Car Loan Payments (Allegation of Mathematical Error)*

Lisa claims:

3.The amount awarded to Lisa from her Bayou Federal loan payments in the ruling was the amount on the Traversal ($16,250.00) plus payments for April and May ($1,300.62) for a total of $17,550.62. The Judgment awarded Lisa $17,793.20. She received $242.58 too much.

The judgment awarded Lisa $17,793.00 for payments to Bayou Federal Credit Union for BMW payments. Lisa complains she was awarded too much. The Traversal lists the amount as $16,250.00. Exhibit "LR.16," with payments through April 2022, lists a total of $16,908.00. In this instance it appears her exhibit of reimbursement was accurate though April 2022, with one more more payment needed to be included ($16,908.00 + $650.31=$17,558.31). In her brief in a footnote, Lisa's states her calculations as: "The Bayou Federal dollar amount came from Traversal ($16,250.00) [. . .] and last regular payment out of Lisa's Capital One account (Exhibit Lisa Capital One.) ($650.31 / month x 2 months for April and May)." This calculation equals $17,550.62 ($16,250.00 plus two

payments of $650.31). Lisa does not explain the $7.69 variation from the total reached when using Exhibit LR.16 plus one payment of $650.31 versus the Traversal plus two more payments. We find the trial court manifestly erred in awarding Lisa $17,793.00 in reimbursement for car loan payments. The award is amended to $17,550.62.

*Reimbursement Awarded to Lisa for the Montana Tractor*

Lisa claims:

4.The Judgment granted a reimbursement claim of $4,500.00 for the Montana tractor. Undersigned counsel has no idea where that award came from. It should be reversed.

In this assignment, Lisa argues she was erroneously awarded $4,500.00 in reimbursement for a tractor. We disagree. The Montana tractor was discussed at trial and in the descriptive lists and the Traversal. Noel's Detailed Descriptive List assigns a value of the Montana tractor at $8,000.00. Lisa's Traversal assigns a value of the Montana tractor at "10-14,000." Noel testified "the Montana tractor is in my position [sic] now. It was allowed me [sic] by the court in May of 21. I paid, financed $10,000.00 brand new for it in like 2006, 2007. I would like to have that back." Noel testified the Montana tractor was community property. Lisa asked, "What's the deal on the tractor?" The trial court replied: "Nothing, I got confused. It's community property and I established the value at $9,000.00. I was wanting to make sure I didn't make a mistake." The tractor was allocated to Noel.

The trial court determined the value of this tractor as follows: "He did –I established—you [Noel's attorney] said it was $8,000.00 in your Detail Descriptive List, and Ms. Yates provided a range on her's, [sic] and I established the value at $9,000.[00]." The trial court's judgment assigned the Montana tractor to Noel and assigned Lisa a $4,500.00 reimbursement claim for the Montana tractor. We are perplexed as to why Lisa would claim this as an assignment of

error, and we find no manifest error in the trial court's award of $4,500.00 in reimbursement to Lisa. This assignment is without merit.

*Lisa's Reimbursement for Credit Card Payments (Allegation of Mathematical Error)*

Lisa claims:

5.The Judgment granted Lisa a reimbursement of "$13,000.00 for her payments to Barksdale Federal Credit Union credit card account ending 0509." This was Lisa's reimbursement claim L – R.15 for $8,376.00 (the balance on the account at termination.) It was denied.

The trial court's exact language at the June 1, 2022 hearing relating to items Lisa would be reimbursed for:

She's going to be entitled to LR.1, LR.3., LR.4., LR.5., 6., 7., 8., 9., all established in her column and all those values are going to be found by the Court, and she be reimbursed. LR.10., 11., 12., 13., 14., 15., 16., 17. and 18. 18. Is $4,057.00 though, and I'm going to allow those reimbursement claims there. But, Ms. Yates, especially on the credit card, it's going to be her responsibility for that debt.

There was a lot of testimony about the community credit card that Lisa continued to use even after the divorce was granted. Following the termination of the community, Lisa used the card for community purposes such as replacement of a 3-ton HVAC System-Outdoor & Indoor in the former community home (Lisa was awarded reimbursement claims for the various AC expenses in the judgment). She also used the card for other community expenses for which she supplied receipts. Additionally, she used the card for her own personal expenses. The trial court was very concerned with the fact that she continued to use the card even after the community terminated. In discussion about the credit card debt, the following exchange occurred:

BY MR. FONTENOT:

Judge, sometimes people talk and they talk to different things. First of all, she's claiming she paid $8,300.00 and something dollars. All we're asking for – what I think the Court is trying to say, "Well, show me where you paid the money." But how are you going to show

that when you continue to charge on the same card, and you continue to mount up a balance on this card. She hasn't proved what she has paid off. Just because that statement shows, that doesn't prove that she paid the initial claim that she's asking reimbursement for. That is her burden to carry not the Court's to decipher how it was done, and how I'm going to find a way to give credit. She has the burden to prove here. Here's the check, I wrote it. Here's five checks, I wrote. It totals [$8,300.00] or whatever the amount was that she claiming [sic] reimbursement. And she hasn't–that 's my objection. I can't get anything unless I can prove to you that I acutally paid it. Me getting up here saying, "Hey, I paid it off." isn't prove when it's disputed.

BY MRS. TALLEY:

If that's the case, Judge, then it hasn't been paid off, and it is a community debt and will have to be added in under community obligations and both parties owe half.

BY THE COURT:

I just – so regardless if it's - - because I haven't looked through all those Capital One statements to know whether or not $8,376.00 has been paid by your client on that credit card bill. The real problem here is let's say I do give her and she has paid that. There's still $13,000.00 in debt that this man's name is potentially - - you know, it could be - - that he would still potentially be liable for, and can result in further litigation to say no that's not mine. I'm divorced this day. You can't come after me, but it doesn't seem to resolve everything by doing the way that you want to do it, Mrs. Talley. The best way is just to resolve it so this is over with for somebody whatever it is. But, hey, whatever[.]

We are unsure of how the judgment arrived at a reimbursement award of $13,000.00 for the credit card in Lisa's favor. Based on the above testimony it seems the $13,000.00 figure was erroneous. We find the record reasonably supports an award of $8,376.00, the amount owed on the credit card at the time of the termination of the community and that Lisa requested reimbursement for in her Detailed Descriptive List. Noel was questioned on cross-examination regarding the credit card: "Q. Lisa has paid it really. So it's not a current debt?" and he responded, "That's correct." Thus, both Lisa and Noel testified that the credit card balance had been paid by Lisa. Moreover, the language in the judgment indicates that Lisa would be responsible for whatever debt remained on the card rather than

21

a denial of her reimbursement claim. The judgment specifically provides that Lisa would be responsible for the payment of the community debt relating to Barksdale Federal Credit Union credit card ending in 0509. Accordingly, the trial court's judgment is amended to award Lisa $8,376.00 in reimbursement for her payment on the credit card ending in 0509.

REIMBURSEMENT CLAIMS

Assignments of error six through twelve all relate to reimbursement claims. Louisiana Civil Code Article 2365 applies to reimbursement claims:

> If separate property of a spouse has been used either during the existence of the community property regime or thereafter to satisfy a community obligation, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.

> If the community obligation was incurred to acquire ownership or use of a community corporeal movable required by law to be registered, and separate property of a spouse has been used after termination to satisfy that obligation, the reimbursement claim shall be reduced in proportion to the value of the claimant's use after termination of the community property regime. The value of that use and the amount of the claim for reimbursement accrued during the use are presumed to be equal.

> The liability of a spouse who owes reimbursement is limited to the value of his share of all community property after deduction of all community obligations. Nevertheless, if the community obligation was incurred for the ordinary and customary expenses of the marriage, or for the support, maintenance, or education of children of either spouse in keeping with the economic condition of the spouses, the spouse is entitled to reimbursement from the other spouse regardless of the value of that spouse's share of all community property.

"[A] paying party is entitled to reimbursement for post-termination, pre-partition use of separate funds for the payment of a community debt. . . . However, the burden of proof is on the party claiming reimbursement." *Hardy v. Hardy*, 18-487, pp. 9–10 (La.App. 1 Cir. 2/28/19), 273 So.3d 448, 456–57; *See also McElwee v. McElwee*, 93-1010 (La.App. 1 Cir. 8/17/94), 649 So.2d 975, *Arterburn v. Arterburn*, 15-22 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163. Thus, for each claim

22

of reimbursement we must determine whether 1) Noel proved that he used his separate property, and 2) whether the separate property was used to pay a community debt.

At the June 1, 2022 hearing, the trial court stated the following about Noel's reimbursement claims (emphasis added):

> I'm going to give Mr. Yates rental reimbursement claim of $2,000.00 per month. The realtor said $1,800.00 to $2,200.00. I'm going to establish the rental value at $2,000.00, and that credit. Also give Mr. Yates credit for – I think it's $7,975.00, paid to Rocket Mortgage. It was apparent that Ms. Yates, and I'll give Ms. Yates credit for her's [sic], and I'll get to her's [sic] in a second. She was paying the mortgage and he was paying half mortgage. So, like, almost a mortgage in [sic] a half was getting paid from the documents that I read. When you acutally look at the statements, she was sending in the whole amount and he was sending in half the amount. So, I give Mr. Yates his credit on that. The Yates estate, Number 11., that's like $39,262.38 my note indicated was from his dad's separate funds. And, so, *if that was used towards the community property that's a reimbursement claim.* The deposits, I believe is, $36,277.00, which is funds that Mr. Yates deposited into their joint checking account *since the date of separation.* That's 5., I'm going to give him credit for that. I think that is all on that, I believe. Okay.

In the judgment, Noel was awarded $158,298.82 in reimbursements; Lisa appealed all of the reimbursement awards except for the $15,500.00 award for attorney fees. We note that numerous items of reimbursement were discussed very little at trial and/or little or no documentary evidence was provided to support the claims, as Lisa points out. However, all of Noel's claims, save the children's insurance premiums, were listed in his Detailed Descriptive List. Regardless of whether documentary or testimonial evidence was presented at trial, Lisa had the opportunity to cross-examine Noel regarding any of the claims he listed in his Detailed Descriptive List, but did not do so. Lisa cannot now claim there was absolutely no proof of certain reimbursement claims when she did not avail herself of the opportunity to cross-examine Noel as to items specifically listed on his Detailed Descriptive List.

23

Louisiana Revised Statutes 9:2801(A)(1)(a) specifically provides that a party's sworn detailed descriptive list is a judicial determination of the community assets and liabilities when one spouse fails to file their own detailed descriptive list. While that is not the case here since Lisa did file her own and a traversal, the same principle holds true when a party fails to produce any contrary evidence at trial of the spouse's valuation of reimbursement claims. In *Brown v. Brown*, 16-31, pp. 5–6 (La.App. 3 Cir. 12/21/16), 210 So.3d 297, 299–300 (emphasis added), a panel of this court addressed the situation where one party does not file a detail descriptive list or otherwise provide any evidence at trial contesting the other party's assigned values:

> Recently, in *Williams*, 968 So.2d 1234, another panel of this court, relying on *Gauthier*, [*v.* Gauthier, La.App. 3 Cir. 11/10/04),]886 So.2d 681, and *Charles v. Charles*, 05-129 (La.App. 1 Cir. 2/10/06), 923 So.2d 786, reiterated the constraints placed upon the party who fails to file its own Detailed Descriptive List timely and leaves in place the trial court ruling making the other spouse's List the order of the court.
>
> The law is clear that *Gauthier* does not require any further evidence to establish the nature of the property in question other than the judicially accepted detailed descriptive list. Thus, the trial court erred in its ruling that Steven failed to prove a prima facie case that the immovable property was his separate property. Although Steven contends his testimony was sufficient to establish a prima facie case, *it was not necessary*. Once the detailed descriptive list was judicially accepted, and *Tamara did not challenge this acceptance*, she lost her ability to traverse the list and contest the classification of the property. There is no legal authority for the trial court's implication that a deed is required to establish the property in question as Steven's separate property. The trial court erred in *ignoring the only evidence in the record,* Steven's judicially accepted Sworn Detailed Descriptive List, which established the immovable property was Steven's separate property.

*Williams v. Williams*, 07-541 (La.App. 3 Cir. 10/31/07), 968 So.2d 1234, arrived at the same conclusion under circumstances more like those before us. In *Williams*, the husband's attorney failed to file his sworn detailed descriptive list until far after the time it had been due even afer a lengthy extension. The husband

claimed that the wife "did not meet her burden of proof with regard to her reimbursement claim because she failed to produce written documentation establishing the amount that she paid to satisfy the mortgage payments and because she failed to specifically state that she used her separate funds to pay the mortgage." *Id.* at 1236–37. At a hearing, the trial court orally ruled that it was recognizing the wife's detailed descriptive list but would allow the husband to offer input at the trial. A panel of this court noted that the husband had the opportunity at trial to question her about her reimbursement claims:

> She was not questioned about her claim for reimbursement or how she arrived at any of the amounts listed on her detailed descriptive list. Before setting the amount of reimbursement due, the trial court specifically asked [the husband] if there was anything he cared to add to the discussion. He again replied in the negative.

*Id.* at 1238.

> It went on to conclude:

> Thomas Williams was free to challenge the reimbursement claim of his former wife at the November 20, 2006 partition trial. He *produced no countervailing evidence at the trial* to dispute Joyce Williams's claim that she had paid all the mortgage payments due on the family residence, along with all maintenance and upkeep, since the date of the divorce. Likewise, *his attorney did not cross-examine Joyce Williams regarding the source of the funds that she used to pay the aforementioned community debts*.

> Joyce Williams's burden of proof regarding her claim for reimbursement at the partition trial was satisfied by her having utilized the procedural vehicle of having her detailed descriptive list deemed a judicial determination of the community. Louisiana Revised Statutes 9:2801 affords the trial court broad discretion in resolving community property disputes. *Crais v. Crais*, 98–1477 (La.App. 4 Cir. 1/13/99), 737 So.2d 785, *writ denied*, 99–763 (La.5/14/99), 741 So.2d 668. Moreover, the judgment of a trial court is presumed correct, absent any record evidence indicating to the contrary. *Steinhoff v. Steinhoff*, 03-24 (La.App. 3 Cir. 4/30/03), 843 So.2d 1290. In view of the fact that Thomas Williams failed to file a scintilla of competent evidence into the record after his former wife petitioned the trial court to judicially partition the community, we cannot say that the trial court was manifestly erroneous or clearly wrong in concluding that the evidence was sufficient to support an award of $7,000.00 in favor of Joyce Williams on her claim for reimbursement.

*Id.* at 1238–39 (emphasis added).

"It is incumbent upon the parties to present evidence at the partition trial regarding the value of the assets." *McLaughlin v. McLaughlin*, 17-645, p. 5 (La.App. 5 Cir. 5/16/18), 247 So.3d 1105, 1111. Uncontested testimony is sufficient evidence. *Id.* Thus, the trial court cannot be manifestly erroneous where Noel's valuations of his reimbursement claims were uncontested at trial. We address each of the items of reimbursement assigned as error by Lisa.

*Reimbursement for Court Costs/Transcript Fee (Under the general assignment of error four subheading)*

Lisa states in brief (footnote omitted):

> Noel offered no evidence whatsoever of the **court costs** he paid. Accordingly, his unproven claims should be denied.
>
> The Judgment awarded Noel $77.00 for **transcripts**. It is unclear where this award came from. The Trial Court ordered that the cost of the transcript of its ruling be shared between the parties. Noel paid for the transcript. If this is the cost of the transcript of the Trial Court's ruling, Lisa has no objections.
>
> If (on the other hand) this is the correct amount of Noel's reimbursement claim for a transcript of any other matter, Lisa asserts that there is no basis in law for an award of a reimbursement claim for transcripts.

Noel's Detailed Descriptive List under the community property liabilities lists:

> . . . .
>
> 3. Court Costs paid by Noel W. Yates          $2,886.79.
> 4. Court costs paid by Lisa J. Yates              658.20
>
> . . . .
>
> 7. Transcripts                                              $2144.92

The trial court's judgment does not mention the award of court costs. It awarded Noel $77.00 for transcript fees. At the June 1, 2022 hearing, the trial court stated the following, "The attorney fees, the court cost, the transcript fees,

and the appraisal fees are all going to be cast as community obligations under the law, and Mr. Yates is entitled to his reimbursement for those, and I think that is what's different then what's on your clients, as far as, -- okay – hold on." The trial court then moved on to a discussion of the tractor issue.

It is true that the trial court's judgment is at odds with the oral pronouncement. A trial court has great discretion in awarding court costs and will not be overturned absent an abuse of discretion. *Noland v. Noland*, 16-641 (La.App. 3 Cir. 4/26/17), 218 So.3d 215, *writ denied*, 17-1162 (La. 9/15/17), 225 So.3d 479. Louisiana Code of Civil Procedure Article 1920 provides the general rule governing court costs: "Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." We are unable to determine from the record how the trial court arrived at a $77.00 reimbursement for a transcript. Nevertheless, Noel's Detailed Descriptive List asserts far more than $77.00 in transcript costs. Noel was questioned on cross-examination, "Okay, let's see, and you've paid for transcripts?" to which he answered yes. Apparently, the trial court found Noel's claim credible, and we cannot say it manifestly erred in assigning him a reimbursement claim of $77.00, as this amount represents far less than that claimed, and Lisa did not offer any evidence to refute Noel's claim. This assignment of error is without merit.

**Assignment of Error Five/ Insurance premiums**

Lisa claims the trial court erred in awarding Noel a reimbursement claim for payment of insurance premiums for the children. The judgment awarded Noel "$2,030.02 for payments on children's insurance premiums." Lisa states (footnotes omitted):

> The Judgment awarded Noel a reimbursement claim of $2,030.02 for payments on children's insurance premiums. The undersigned could not locate either the award in the ruling of the Trial Court or any testimony or exhibit showing said amounts to be paid. Accordingly, it should be deleted as a reimbursement claim for Noel. [12]

Noel did not request reimbursement for payment of children's insurance premiums in his Detailed Descriptive List. Noel testified that he began paying the premiums on the life insurance policies for the children once the divorce was final.

At the June 1, 2022 hearing, the trial court stated:

> Cash value, I.6., $986.82 and $1043.20 [sic], and those are going to be Mr. Yates, Noel Yates.

BY MRS. TALLEY:

> Would you tell – would you state those again? $9 - -

BY THE COURT:

> $986.82, I think the testimony in the documents - - there were so many documents I didn't write –

BY MRS. TALLEY:

> Okay.

BY THE COURT:

> $986.82 and $1,043.00, those are the two life insurance policies for - - on the children who Mr. Yates are the beneficiary of.

This award is for the cash value of the two insurance policies on the children rather than premium payments. Noel does not address the assignment of error in his brief. We find it was error by the trial court to award Noel a reimbursement claim for the cash value of the life insurance policies. Accordingly, we reverse the trial court's award for reimbursement of children's insurance premiums.

---

[12] Lisa requested reimbursement of $156.00 for payments of $13.02 per month on the policy from February 2020 through February 2021.

**Assignment of Error Six/Appraisal Fee**

In this assignment, Lisa argues the trial court erred in granting Noel a reimbursement claim for $250.00 for the appraisal of the former home without granting Lisa the same. Lisa argues that the trial court ordered Noel and Lisa to each pay one-half of the cost of the appraisal prepared by Thibodeaux in the amount of $500.00 and that if Noel is to receive reimbursement without a copy of this receipt or cancelled check, Lisa should be awarded the same; alternatively, the claims, which offset each other should be removed from the Judgement. Noel does not address this assignment in his brief. The trial court obviously concluded that Noel paid the $500.00 appraisal fee and was due reimbursement for half. Noel did testify, "The appraisal fee is what I had to pay the Clerk's Office to get the appraisal." Accordingly, we find no manifest error in the trial court's award of $250.00 reimbursement to Noel for the payment of the appraisal fee. This assignment of error is without merit.

**Assignment of Error Seven/Health, Vision and Dental Insurance**

Lisa argues the trial court erred in awarding Noel reimbursement of $12,920.09 for payment of health and vision insurance when it was ordered as spousal support. Lisa's argument in its entirety is (footnote omitted):

> [T]he Trial Court ordered Noel to keep Lisa covered on his insurance until after the divorce was granted. This is support of persons, a separate debt of the payer. He should have no reimbursement claim for that. Additionally, this amount just appeared on his last filed sworn detailed descriptive list. Nowhere in the testimony did he verify this amount. Neither is there any documentary evidence of it. Accordingly the claim should be denied.

Lisa cites no law in support of her claims.

Noel's full response to this assignment of error: "Appellant further contends that Noel Yates was granted a reimbursement claim for health, vision and dental

29

insurance in the amount of $12,920.08.  Appellant argues that that was an element of spousal support but there is absolutely no court order requiring that be paid as an element of spousal support."  We agree.

Noel testified on cross-examination:

Q. Okay. Alright.  This health, vision and dental insurance, that's something that the judge ordered you to pay for her until July 1st. Is that correct?

A. Correct.

Q. Did you keep it through July 1st?

A.  It was cancelled June 30th.

The trial court's Interim Order dated June 23, 2020, ordered that "any insurance coverage maintained by either parent shall remain the same until further orders of the Court, meaning that no one will be dropped from or reduced in insurance coverage."  Supplemental Interim Orders dated January 6, 2021, reiterated the same.  The Judgment of Divorce dated June 23, 2021, declared that "all other orders of the Court shall be and they are hereby declared unaffected by this judgment.  Said orders include, but are not limiter [sic] to injunctions, order to pay a monthly amount for household expenses or maintenance, etc."

The trial court's "order" was simply to maintain existing community insurance policies.  It was not an element of spousal support pursuant to a consent judgment.  Similar to the payments Lisa made for homeowner's insurance, Noel is entitled to be reimbursed for separate funds he used to maintain Lisa's health insurance subsequent to the termination of the community but prior to the partition. While it is true that Noel provided no documentary evidence or testimony supporting this amount, it was listed in his detailed descriptive list.  Moreover, Lisa did not challenge the amount at trial, only the characterization of the payment. Thus, the trial court did not err in finding Noel is entitled to reimbursement for

$12,920.08.  Noel is entitled to one-half of $12,920.08.  This assignment of error is without merit.

**Assignment of Error Eight/Mortgage Payments**

Lisa claims the trial court erred in awarding Noel reimbursement of $7,975.00 for payments to Rocket Mortgage when he did not prove he paid that much.  Lisa claims he only proved $4,862.50.  She stated he only submitted a few checks into evidence and that the notations on them are unclear.  Noel states in brief, "We will defer to all exhibits that were filed into evidence showing the payments made to Rocket Mortgage, either directly or checks that were given to Lisa Yates and deposited to her checking account for his one-half of the monthly payment."  Nevertheless, Noel did assert the claim of $7,975.00 for mortgage reimbursement payments in his Detailed Descriptive List, and the trial court found Noel's testimony credible.  We find no error in that finding.  The checks that were submitted into evidence are listed below:

| CHECK # | DATE | AMOUNT | PAYABLE TO | NOTATION |
|---|---|---|---|---|
| 1015 | 4/17/2020 | $300.00 | Lisa Yates | Ref #1012 (1/2 Covid mortgage) Marshall Softball |
| 1018 | 5/7/20 | $562.50 | Lisa Yates | ½ Covid Mortgage $200 Marshall |
| 1040 | 10/30/2020 | $1000.00 | Lisa Yates | [sic] + car note |
| 1184 | 5/28/2021 | $725.00 | Lisa Yates | ½ Mortgage Pay |
| 1185 | 6/23/2021 | $725.00 | Noel Yates | ½ Mortgage |
| 1194 | 7/30/2021 | $725.00 | Rocket Mortgage | [Account Number] |
| 1196 | 8/26/2021 | $725.00 | Rocket Mortgage | Principal Only [Account Number] |
| 1093 | 12/23/2021 | $725.00 | Rocket Mortgage | [Account Number] |
| 1152 | 1/24/2022 | $725.00 | Rocket Mortgage | [Account Number] |
| 1155 | 2/22/2022 | $725.00 | Rocket Mortgage | [Account Number] |

31

The Rocket Mortgage statement evidence indicates payments in $725.00 increments on the following dates: 8/10/21, 9/2/21, 10/2/21, 11/1/21, 1/08/22, 2/01/22, 3/01/22, and 3/22/22. In addition to the seven payments noted above in the check evidence, the four payments from September, October, and November 2021, plus the payment dated March 22, 2022 equals Noel's claim of $7,975.00 due in reimbursement. The testimony was clear at trial that, except during a COVID forbearance period when partial payments were made of $500.00,[13] Lisa paid the full mortgage payment while Noel paid $725.00. Accordingly, we find the trial court did not manifestly err in awarding Noel $7,975.00 in reimbursement for mortgage payments. Noel is entitled to one-half of the payments of $7,795.00. This assignment of error is without merit.

**Assignment of Error Nine/Rental Payments**

In this assignment of error, Lisa argues the trial court erred in awarding Noel $2,000.00 per month (for a total of $41,400.00) in rental reimbursements for Lisa's use of the community home. Lisa argues the trial court legally erred because the requirements of La.R.S. 9:374 were not met, thus, no reimbursement is due. Lisa states the trial court's deferral of the matter, without agreement of the parties, was not authorized by law and renders the rental issue moot. Louisiana Revised Statutes 9:374(C), as it was applicable in this case, stated (emphasis added):[14]

---

[13] It is unclear from the record how those payments were credited and to whom.

[14] Louisiana Revised Statutes 9:374 was amended in June 2022, and became effective August 1, 2022, to specifically authorize a trial court to defer the issue of rental determination until partition without agreement of the parties (emphasis added):

> C. A spouse who, in accordance with the provisions of Subsection A or B of this Section, uses and occupies or is awarded by the court the use and occupancy of the family residence, *a community immovable occupied as a residence,* or a community manufactured home as defined in R.S. 9:1149.2 and occupied as a residence, regardless of whether it has been immobilized, *shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided.*

A spouse who, in accordance with the provisions of Subsection A or B of this Section, uses and occupies or is awarded by the court the use and occupancy of the family residence, a community immovable occupied as a residence, or a community manufactured home as defined in R.S. 9:1149.2 and occupied as a residence, regardless of whether it has been immobilized, shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided. *If the court awards use and occupancy to a spouse, it shall at that time determine whether to award rental for the use and occupancy and, if so, the amount of the rent. The parties may agree to defer the rental issue for decision in the partition proceedings. If the parties agreed at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.*

Lisa cites numerous cases for the proposition that no reimbursement claim can lie when the trial court did not contemporaneously order a rental value or the parties did not agree to defer the rental value issue, relying on the law set forth in *McCarroll v. McCarroll*, 96-2700 (La. 10/21/97), 701 So.2d 1280, as cited by the second circuit in *Mason v. Mason*, 40,804, p. 5 (La.App. 2 Cir. 4/19/06), 927 So.2d 1235, 1239, *writ denied*, 06-1524 (La. 10/13/06), 939 So.2d 366:

In *McCarroll v. McCarroll*, 96–2700 (La. 10/21/97), 701 So.2d 1280, the Louisiana Supreme Court held that rental payments may not be retroactively assessed under La. R.S. 9:374(C) unless otherwise agreed by the spouses or ordered by the court. The court reasoned that the use and management of a thing held in indivision is determined by agreement of all the co-owners. A co-owner is entitled to use the thing held in indivision according to its destination, but he cannot prevent another co-owner from making such use of it. Nevertheless, it is well established that a co-owner need not pay rent to another co-owner for his exclusive use of the co-owned property. The assessment of rent under La. R.S. 9:374(C) requires an agreement between the spouses or a court order for rent contemporaneous with the award of occupancy. *McCarroll v. McCarroll*, supra. When there is no evidence of court ordered rent or an agreement between the parties, the occupying

D. In a proceeding for divorce or thereafter, *a spouse may move for an award of rent at any time. After a contradictory hearing, the court may award rent to be paid by a spouse exercising exclusive use and occupancy of a residence whether by judgment or in fact. The award shall be retroactive to the date of filing of the motion, but rent shall be awarded only for the period of exclusive occupancy.* The adjudication of the issue of rent and the amount thereof *may be deferred to a later date by the court or by agreement of the parties.* It shall not be a prerequisite to the award of rent that the spouse against whom the award is made shall have requested use and occupancy of the residence.

spouse is not liable for rent. *Gay v. Gay*, 31,974 (La.App. 2 Cir. 6/16/99), 741 So.2d 149.

In *Bulloch*, 214 So.3d 930, the appellate court noted *McCarroll,* but went on to find that rental reimbursement was due even though the parties had not agreed to defer the rent issue to the partition hearing and the trial court did not contemporaneously award rent. The appellate court affirmed the trial court's award of fair rental value to the ex-husband, stating:

> We find no legal error in the trial court's ruling. La. R.S. 9:374(B) states, in pertinent part, that "either spouse may petition for, and a court may award to one of the spouses, *after a contradictory hearing*, the use and occupancy of the family residence ... pending further order of the court." (Emphasis added.) Likewise, R.S. 9:374(C), upon which Lydia relies, expressly states that its provisions apply to the awards of use and occupancy pending divorce or partition of the community property made "in accordance with the provisions of R.S. 9:374(A) and R.S. 9:374(B)," which, as noted above, require a contradictory hearing. Although the court awarded Lydia use and occupancy of the family home "on an interim basis" at the October 30, 2013, hearing concerning the misappropriated funds, *the record is clear that there was no contradictory hearing on the issue of use and occupancy and whether Brian was entitled to rental value.* Brian properly demanded rental value of the home in his answer and reconventional demand along with a contradictory hearing on the matter to which he was entitled under La. R.S. 9:374(B).

*Id*. at 934–35 (second emphasis added).

In *Hight v Hight*, 17-566, pp. 11-12 (La.App. 4 Cir. 12/13/17), 234 So.3d 1143, 1150, the appellate court reiterated the trial court's discretion in deferring a determination of rental value:

> In this matter, the trial court decided to continue the rule for rental reimbursement and the valuation issue to be addressed at the community partition trial. It is well established that a trial judge has vast discretion in conducting a trial, "and it is only upon a showing of a gross abuse of discretion that appellate courts have intervened." Further, "[a] final judgment is one that determines the merits in whole or in part and is identified as such by appropriate language." An interlocutory judgment does not determine the merits but only the preliminary matters in the course of a trial. In the case *sub judice,* this Court does not find that the trial court abused its discretion in continuing the rule and the valuation to the community partition trial.

In this case, a hearing was held on May 25, 2021, at which time the trial court reviewed some issues that were no longer before the court such as the granting of divorce. There is no transcript of this hearing in the record, however Noel attached a two-page transcript from the May 25, 2021 hearing that only has a statement by the trial court copied in part here (emphasis added):

> So those are the issues before the court today, or that haven't been dealt with previously. *So we'll start off with – we'll start off with the issue of – the issue of the rental value and that claim of – and Ms. Talley just cites a lot of Code Articles, but no specific ones just in an abroad [sic] category. I'm going to defer that to the – whenever they deal with the community property.* There's nobody seeking to partition as far as in the sense of filing the necessary documents to – to do that.

The two-page document evidences no objections by either party. It only contains what the trial court stated. The minutes of court from that day state:

> Case taken up and evidence adduced.
> Fontenot continued with cross Lisa Yates.
> Objections made and ruled on by the Court.
> Both parties rest.
> The Court for oral reasons-rental value deferred to property settlement[.]

Lisa's brief and reply brief point to her objections during the partition hearing that the rental value determination based on the appraisal being hearsay. She did not submit any evidence indicating her objection to the deferral at or following the May 25, 2021 hearing. Accordingly, we find no gross abuse of discretion when the trial court announced its intention to defer the rental valuation issue, without contemporaneous objection. Lisa acquiesced to the determination of the rental value at a later date at the hearing on May 25, 2021. We find no manifest error of the rental valuation at $2,000.00 per month. Thus, Noel is entitled to reimbursement for one half of the value of rental reimbursement of $41,400.00. *See Averill v. Averill*, 18-299 (La.App. 1 Cir. 9/21/18), __ So.3d __;

*Thomas v. Thomas*, 22-141 (La.App. 5 Cir. 12/28/22), 356 So.3d 548, *writ denied*, 23-124 (La. 4/4/23), 358 So.3d 868.

**Assignment of Error Ten/Property Taxes**

Lisa argues the trial court erred in awarding Noel $2,607.34 for payment of property taxes. We agree. Noel plainly stated he only paid one payment of $850.00, otherwise the previous payments were split. Noel testified on direct examination:

Q. Okay. And – did you have – who paid the property taxes since the termination of the community?

A. I paid the full amount last year for last year's taxes.

Q. Alight. [sic]

A. $800.00 something for last year. *And we've split the difference on the two previous years.*

Q. Alright. We'll [sic] you have property taxes on a home you listed $2607.34.

A. Correct.

Q. Was that [the] total amount of the property taxes that you've paid?

A. That's what we've turned in. Yes, that's correct.

On cross-examination, Noel testified:

Q. Okay. Alright. And them [sic] property taxes on the home, $2,601.34. Do you have the receipts for that? Cancelled checks for it?

A. I do. There's a discrepancy on that. We split the first two. It–so for the sake of agreement $450.00 a piece [sic]. The last one I paid completely $850.00. There was [sic] other fees that we had paid going through the secretary running the list of receipts over that is going to be in there. I think that is going to be acutally a payment for income tax that we paid jointly and 19.

. . . .

A. Again, it may – it may simply just be a typo. I'm trying to figure – whenever I was asked that a while ago it was $450., $450.00, $850.00. That's what we pay.

36

Q. Okay. So you think maybe $850.00 might be the right number instead of $2,607.34. Is that right?

A. Ma'am?

Q. So, do you think that $850.00 might be the correct number instead of $2,607.00?

A. If I remember correctly and I do have the receipts $854.00 something is what I paid this time.

Q. Okay.

A. *The two years previously we have* [sic] *split it*, which comes out to around $450.00.

Q. Okay. So, if the Judge says those are a wash, you'd still have $850.00.

A. Sure, yes.

Noel submitted check #1059 evidencing his payment of $859.34 to the Vernon Parish Tax Collector. The trial court manifestly erred in awarding Noel reimbursement of $2,607.34 for the payment of property taxes. Noel is entitled to reimbursement for one-half of $859.34 which equals $429.67.

**Assignment of Error Eleven/Yates estate**

Lisa argues the trial court erred in awarding Noel a reimbursement claim for the "Yates Estate." We agree. Noel was awarded $39,262.38 for "Yates Estate." At the partition hearing,[15] the trial court stated:

---

[15] The minutes from the hearing state:

Trial – Community Property

. . . .

Case taken up and evidence adduced.
On motion of Fontenot, the Court grants motion to take Judicial Notice of Appraisal taken by Century 21 previously filed into the record.
On motion of Fontenot, the Court grants motion to take Judicial Notice of the Affidavit of Small Succession previously filed into the record, no objection by Talley.

Oral argument between Fontenot and Talley.

The Yates estate, Number 11., that's like $39,262.38 my note indicates was from his dad's separate funds. And, so, if that was used towards the community property that's a reimbursement claim.

Noel's response to this argument in brief is reprinted in full (emphasis added):

> Appellant later on in her brief raises the issue of the $39,262.38 of funds that Noel deposited into an account as money he received from the succession of his father. Noel furthermore testified that *he used that money to make improvements to the former community property, which included the apartment that he renovated to care for his father before he died.* . . . Appellant's argument [is] that this money is not reimbursable because they [sic] were received during the community property regime. That is not accurate. They [sic] were [sic] received but they were clearly traceable and delineated as being the separate property of Noel Yates, which he inherited from his father.

In *Bulloch*, 214 So.3d at 944, the court stated:

> If separate property of a spouse has been used either during the existence of the community or thereafter to satisfy a community obligation, that spouse is entitled to reimbursement for one-half of the amount or value the property had at the time it was used. La. C.C. art. 2365; *Bodenheimer v. Freitag*, 94-2573 (La. 1/6/95), 651 So.2d 251. The burden of proof is on the party claiming reimbursement to show that separate funds existed and were used to satisfy the community obligation. *Tippen v. Carroll*, 47,415 (La.App. 2 Cir. 9/20/12), 105 So.3d 100. Where separate funds can be traced with sufficient certainty to establish the separate ownership of the property paid for with those funds, the separate status of such property will be upheld. *Curtis v. Curtis,* [403 So.2d 56 (La.1981)].

"Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property." La.Civ.Code art. 2340. We find that Noel proved he received inheritance funds totaling $15,969.79. However, the fact

Court takes Judicial Notice of Ms. Perkins' analysis.
Defense stipulates separate property; Mr. Yates may retrieve those items if he wishes.
Objections made and ruled on by the Court.
Case submitted. For oral reasons and evidence adduced, the Court fixed ruling for June 1, 2022 at 10:00AM.
Court adjoined.

that Noel received an inheritance does not entitle him to automatic reimbursement. Noel must prove he is owed reimbursement for expending his separate property for a community purpose.

Noel's claim that he used his inheritance to improve the community home is completely contrary to the evidence he presented. Noel's last Detailed Descriptive List filed May 27, 2022, lists "Yates Estate" as "TBD." The documentary evidence indicates the receipt by Noel in November 2019, of $15,969.79 ($8,701.85 Edward Jones and Columbia Financial Group statement of $7,267.94) in inheritance funds, which totals $15,969.79, as discussed in the first assignment of error.) Noel specifically testified about the $15,969.79 in inheritance deposits, but offered no testimony about the remaining $23,292.59 that is completely unaccounted for in testimony or documentary evidence. Although inherited money is usually easily distinguished as separate property of a spouse through documentation, one must still prove that the separate property was used for a community purpose.

There was significant testimony at the trial regarding the "barn apartment" that Noel "improved" and whether it was for his benefit or his father's benefit. We find this distinction irrelevant. Noel testified numerous times that he did not use his separate property to improve the barn apartment.

Noel was questioned on direct (emphasis added):

> Q. Okay. And did you expend any of your funds *that you inherited from your father* to improve any of the property located that was community property between you and Mrs. Yates?
>
> A. *Not any of my funds*. Dad past [sic] in September, and the succession was done in January. She was pushing me to get the divorce filed, get it filed, get it filed, . . . .
>
> . . . .
>
> Q. Okay. When you were building this apartment, did you expend any of the money that *you inherited from your father*?

A. *No.*

Q. Did you expend any of the money that you yourself had that was your separate property?

A. In building it?

Q. Yes.

A. I mean, we were – by 2018 I was no longer using the – our joint checking account anymore.

Q. Alright.

A. I mean, I didn't have a debt [sic] card anymore, nothing.  So, it was all –yeah – money.

[MRS. TALLEY:]

I'm not sure I understood that answer.

Q. Can you repeat that response you just gave?

A. If I understand – I'm going to repeat the question as I understood it.  Did I spend any of *my money* building the apartment?  Well, the answer would be yes, *because we were still together when it was initially built.*  To finish it off, right around the time of daddy's death, succession, trying to figure out what to do with him until he passed.  It was mainly *his money that was spent to finish off things and maintain his property.*  The items that we spent money on between my sister and I on daddy's stuff is still the same stuff that's at the house that we have never had excess [sic] to [.] . . .

Q. Okay. So after your father died, *did you spend any money that was your separate money* on improving any of the buildings or structures on the property?

A. *No.*

Noel was even questioned by the trial court:

BY MR. YATES:
Number 12, the Yates estate, there is receipts, that is what Mr. Fontenot and I spoke about first. *That is moneys that was spent on the nonmovable of the property solely off of dad[']s money before he passed.*

BY THE COURT:

Okay.

40

BY MR. YATES:

In preparation for moving him there at some point.

BY THE COURT:

And that was improving to the value of the property.

BY MR. YATES:

Correct. And that number if I'm not mistaken was right at $4,700.00.

However, Noel was later questioned on direct:

Q. . . .I'm going to show you these documents here, and there's 23 of them and I want you to go through each one and look at them and tell us if – my question is are those sums of money expended to improve the property that you and Ms. Yates owned? Particularly the barn property that's in connection with the apartment you built for your father.

A. Yes, this is the complete list to include my hand written note. When I turned it in, not only the apartment, but like I say the equipment still maintain [sic] on the property that came from the succession.

Q. And, what was the source of the money that was used to pay that?

A. Dad.

Q. *Money you inherited from him? Is that correct?*

A. *Correct.*

However, on cross-examination regarding the apartment portion of the barn,

Noel testified:

Q. Okay. Alright. Now, one of the exhibits that you entered into evidence is Noel Yates 11, was a number of receipts and – If I understand this right, you – well the date of this receipt is 5/27/19. So May of 19.

A. Yes.

Q. There's another May of 19, July, August, September all in through there. *At that time, your dad was still living. Is that correct?*

A. He had his first surgery in April.

41

Q. Okay. What was the date of your dad's death?

A. *September of 19*.

Q. Okay. Now, did he live in this area? In the Leesville area?

A. Yes, ma'am.

Q. Was he in good health before he died?

A. No, ma'am.

Q. What would you say his physical limitations were?

A. He couldn't walk or stand.

Q. Couldn't walk –

A. Walk or stand.

Q. Walk or stand – excuse me, I'm sorry.

A. *Mentally, he was gone*.

Q. Okay, how long was he in that condition?

A. From the time I found him – he deteriorated fast. I found him in late October of 18 in bad shape. I maintained him at his residence until [he] broke his back in April.

Noel Yates 11, one of the exhibits offered by Noel, is comprised of many receipts for charges related to the apartment. All of the receipts that use the account number bearing the last four digits of 7477 also have a handwritten note stating "DAD" directly under the 7477. There was no evidence that the account "7477" was Noel's personal account that held separate funds. Rather, it was his father's debit card that was being used to purchase items for the barn apartment. Some of these receipts (from places that print out invoices) are even in the father's name. There are over twenty receipts all of which evidence purchases made between May 2019 and August 2019. The last chronological receipt was dated September 14, 2019, which was before his father died. Noel also submitted a

handwritten sheet created by him that states, "Receipts Dad paid for this" that lists twenty-five receipts dated before his father's death.[16]

The receipts prove that the purchases were made before his father's death on September 22, 2019, and long before he received his inheritance checks that were issued on November 5, 2019 ($7,267.94) and the other around November 22, 2019 ($8,701.85). The evidence is clear that money spent on the barn apartment was from Noel's father's debit card while the father was still alive and during the existence of the community. Thus, according to La.Civ.Code art. 2340, these funds were presumed to be community.

> Louisiana jurisprudence has firmly established that the only issue with respect to gifts of this nature is whether the donor intended her donation as a gift to the individual or to the community. In answering that question, the intention of the donor controls the identity of the donee or donees. *Allbritton v. Allbritton*, 561 So.2d 125 (La.App. 3rd Cir.), *writs denied*, 565 So.2d 445, 454 (La.1990). As stated earlier, the burden of overcoming the presumption of community property set out in LSA–C.C. Art. 2340 rests upon the party who asserts that the property is separate. *Id.*

*Hebert v. Hebert*, 94-864, p. 4 (La.App. 3 Cir. 2/15/95), 650 So.2d 436, 439.

Because the father's donative intent cannot be established since he is deceased, and the only other evidence relating to the father's intent was Noel's own testimony that "[m]entally [his father] was gone[,]" the money spent on the barn apartment was community funds, and Noel has no reimbursement claim for these expenditures. Even if he had proven the funds were his separate funds and that they were used for a community purpose, that would only amount to about $5,000.00, far less than the $15,969.79 Noel proved that he inherited or the $39,268.38 he was awarded for "Yates estate." The trial court manifestly erred in finding that Noel met his burden of proving he had any claims for reimbursement

---

[16] Some of these receipts in the handwritten list are duplicative of the photocopied receipts.

for separate inheritance funds expended for a community purpose. Thus, Noel is not due any reimbursement for "Yates estate." It was manifest error to award a reimbursement claim for "Yates estate" in the amount of $39,262.38. Accordingly, we reverse the trial court's award of $39,262.38 for "Yates estate."

**Assignment of Error Twelve/Deposits Into Joint Account**

In her final assignment of error, Lisa argues the trial court erred in awarding Noel a reimbursement claim for deposits of $36,277.00 into the joint account. Noel's detailed descriptive list asserts $36,277.00 due in reimbursement for "[d]eposit made to joint bank account since separation[.]" In this assignment, Lisa states (footnotes omitted):

> Noel claimed he **deposited** $36,277.00 into the **joint banking account** after separation. First the parties separated sometime during the summer of 2019; but he did not file his divorce petition until February 27, 2020. Only deposits made after that date are presumed to be use [sic] of his separate funds.
>
> Next, Noel offered no documentary evidence of that amount being deposited by him into the joint account. He said the amount did not include the $2,000.00 / month they first agreed on, the $1,000 / month they agreed on at the first hearing, or the $900.00 / month the Trial Court awarded for interim spousal support between March 17, 2020 and May 31, 2020. Some of the few checks he produced were credited elsewhere, such as for payment of the mortgage. One was to give Lisa ½ of the tax refund, for example. To allow a credit in more than one place is double-dipping and should be reversed.
>
> . . . .
>
> Further, Noel's deposits should have been reduced by his payment of $900.00 / month in between March 7, 2020, and May 31, 2021 (for a total of $13,275.00) interim spousal support to Lisa, pursuant to, orders of the Trial Court, and credit sign applied elsewhere.

Noel's brief does not address this assignment of error.

At the June oral hearing on the judgment, the trial court stated: "The deposits, I believe is [sic], $36,277.00, which is funds that Mr. Yates deposited into

their joint checking account since the date of separation.  That's 5., I'm going to give him credit for that."

Noel's counsel identified the accurate time period in question regarding the validity of payments made from separate property early on in questioning:

Q.  Okay, well let's go - - go through each one, and tell us what you expended, and how much you expended of the money you just identified as your dad's money.

A.  From November until February.

Q. And November

A.  19 until February of - -

Q.  19 until February of - -

A. 20.

Q.  20.

A.  I'm still there.  I'm still spending money there.  I'm still sending money into the joint account.  We're paying bills out of that money.  We're - - it's normal everyday living expenses.  I'm maintaining – I'm still there maintaining the property.  That is money that goes direct into the account.

Q.  Okay.  And, so, do you have any documentation to show specifically what that money was used to pay for?

A.   I have the cancelled checks where I was sending her $2,000.00 per month.  I have –

Q.  Out of that account?

A.  Yes.  I have – yes.

On this subject, Noel testified (emphasis added):

A. In February [the mortgage payments were] coming out of the joint account.  Our joint Capital One account.  My direct deposits ended in February.  I continued to pay her $2,000.00 per month.  Is [sic] something we agreed on verbally, until which time we had the first zoom hearing and at that point in time we agreed to $1,000.00 that I continued to pay until May of 21.  The order on that was to pay $1,000.00 per month for expenses is the way it was written in the order.  But, at that point in time from April until

45

October, April of 20, until of October of 20, I had placed the house in forbearance because she wasn't employed at the time.

At the partition trial, Noel was questioned by the trial court:

BY THE COURT:

So, what I have to make sure, Mr. Yates is one, if you inherited money from your family, that's separate property. Post separation money is your separate property. And, so, did separate money go for community property? That's what I have to consider – like there's some reimbursement claims, okay, for stuff paid. And did you use the money you inherited from your father or did you use your personal money post separation to pay things then there is some reimbursement claims because it's your separate property. It was not a community thing at that point. Especially, inheritance you know, if somebody inherited $5,000.00 and you went to pay the house note, well you're entitled – that's – what was yours not y'all's money.

BY MR. YATES:

Maybe I'm not answering correctly. When dad passed and succession was done there was a significant amount of succession money put into the accounts that I opened prior to us filing for divorce. We were still married. So, those moneys are deposited into that account literally a month before filing. This is the same two accounts that I moved direct deposits too [sic]. These are the same accounts that I have paid along the way everything to her, to include the $2,000.00 per month until we actually had court and had a judgment.

BY THE COURT:

So you did expend separate property funds *you got from your father – your inheritance from your father to pay community debts. And so legally you want that your entitled to back in those.*

BY MR. YATES:

Yes.

BY THE COURT:

And I'll let Mr. Fontenot and Mrs. Talley go into grader [sic] detail. I'm just trying to understand everything. *You know, how much money is in there, that's your business.* Okay. Unless it was a community thing, and then that becomes our business. You know, but if you used your money same thing with Ms. Yates, if she got money that she inherited or somebody gave her then we have to calculate all that. So we have to know, I guess what to ask and not to ask. . . .

46

. . . .

BY THE COURT:

Now I will ask a question before I turn the lawyers back loose. That moneys from those two Barksdale accounts is that, that you expended, because only your [sic] going to have the knowledge and there will be a paper trail. Is that reflective, Mr. Yates in this reimbursement part that you've laid out here?

BY MR. YATES:

There - - in the reimbursement- -

. . . .

BY MR. YATES:

I – I hope so. That is the accounts I've had – all moneys [sic] I had in a check form goes into that account. Everything I pay go goes out. Essentially, I'm paying the bills there - -

BY THE COURT:

But, did it go out through one through 12 on that page five [Noel's reimbursement claims on his detailed descriptive list]?

. . . . .

BY THE COURT:

Did you use money from Barksdale, one and two *I'll call it that is your separate property from your dad* – did that go – is that reflective [sic] in one through 12 on page five? Or do we need to be looking somewhere else for that moneys?

BY MR. YATES:

All of that moneys [sic] went to the same place. I mean, that's the only way I know how to answer that. Everything I'm paying for and have paid for, paying rent during all this, the expenses that during the time that she wasn't working, the money I was sending her that's all from that account.

BY THE COURT:

And that is reflective one through 12? Or is that reflective –

BY MR. YATES:

47

Well, yes.  It is deposits made into the account since separation, $36,277.00.

BY THE COURT:

Okay. So now we know that you've put that much money from your separate funds into deposit number five.  Is [sic] correct?

BY MR. YATES:

Correct.

BY THE COURT:

Okay.  Well, that gives a number to work with.  You know, if you expend $36,000 of your separate money into community debts, that's number five on page five, Mrs. Talley and Mr. Fontenot. According to Mr. Yates, that's where some of it is reflective.

Noel testified that the sources of the inheritance from his father's estate were "an insurance policy, it was a bank account, and an Edward Jones Account."  As previously noted, Noel only testified, and the evidence in the record only established, that he received $15,969.79 in inheritance money that was deposited into his Barksdale account.

Later in the record, he was asked on cross-examination:

Q. Okay. Alright.  And then Number five, deposit made into joint bank account since separation.  Now, does this include the alimony checks that you wrote, or deposited there or whatever?

A. The $1,000.00 per month? The ordered $2,000.00 per month?

Q. Yes, Sir.

A. No ma'am.

Q. Okay. What kind of evidence do you have that supports that?

A. It is in the direct deposits in the bank – in the bank statements.

Cross-examination continued:

Q. Now, but what should be on here, on your last list but, hasn't been on the list would be that account at Barksdale Federal Credit

Union that has account number 2202 and 2201. The second one being savings. Those should be on here. Correct?

A. And they are.

Q. That's an account that you had established while y'all were married.

A. Correct.

Q. And you put your pay roll check in there.

A. Only after the divorce filling [sic]. Yes.

Q. Okay. Well you continued [sic] to use it now though. You continued [sic] to use that same account now?

A. Yes, it's the same accounts I had since then.

Q. Alright. Are you saying that everything that went into that account before you file your petition for divorce was your dad's money?

A. Pretty close. I put some overtime checks, or some detailed [sic] checks along the way. I was paying for Tanner.

Q. Okay, but it was overtime you earned while you were married. Correct?

A. Yes, details, yes.

Noel then testified about the community funds addressed in assignment one.

Lisa testified:

He - - paid - - he - - up until we filed for divorce at the end of February he paid $2,000.00 per month toward expenses. And then once we filed for divorce in March, I think he paid $2,000.00. And then in April you told him to pay $1,000.00, and he started paying $1,000.00 towards expenses.

Noel was questioned by the trial court near the end of the trial:

BY THE COURT:

Mr. Yates, I've got a question while they're doing that. [XXXX]1011, there is about $39,262.38 worth of what I would call money that you got from your dad that you show deposits into an account from your accounts that you opened up from your dad's estate. Is that approximately correct? That would be Number 11 on your reimbursement claim.

49

BY MR. YATES:

Yes.

BY THE COURT:

Okay. And then Number 5 says deposits you made to the joint account since separation, which is $36,277.00. *Is that a different account and where did that money come from?* Your salary from the sheriff or money from that – since you separated. So is that $39 plus the $36 that you've put towards that you're asking reimbursement for?

BY MR. YATES:

My salary was direct deposited into the Capital One that I didn't have access to.

BY THE COURT:

And that's the one where all the bank payments were coming out of that Ms. Yates had control over.

BY MR. YATES:

That's correct, that's correct.

[NOEL YATES]:

And then I continued to pay after I pulled my direct deposit, which was after filing, I continued to pay her us agreeing $2,000.00 per month until the court ordered $1,000.00 per month.

BY THE COURT:

Okay. And, so, that would have been from February, I think you filed about February 27th–

BY MR. YATES:

That's correct.

BY THE COURT:

And when was the $1,000.00? I don't have that.

BY MR. YATES:

It would've started in April of 20.

BY THE COURT:

50

2020?

BY MR. YATES:

April of 20.

BY THE COURT:

Okay. So you've paid March and April. So you've paid $2,000.00 for two months. This $36,277.00, where did that come from? What is that? Is that the $1,000.00 per month you put in that account?

BY MR. YATES:

And the direct deposit from separation.

BY THE COURT:

Right. The $2,000.00 then the $1,000.00, so you're counting every month you put $1,000.00 or $2,000.00 in there?

BY MR. YATES:

That's correct.

BY THE COURT:

Okay. I'm just trying to understand where – was that a – it's a fairly lengthy, you'll probably know or Mrs. Talley or Mr. Fontenot will know. The $1,000.00 that wasn't spousal support or child support? That was just paying the bills?

BY MR. YATES:

In the order, it said expenses and bills.

BY THE COURT:

Okay. Is that correct, Mrs. Talley.

BY MRS. TALLEY:

I'm sorry.

BY THE COURT:

Expenses and bills, the $1,000.00 in the Court order was for him to continue to pay expenses and bills till whatever –

51

BY MRS. TALLEY:

Yes, yes.

Noel testified that his separate funds were used to satisfy community debts, "everyday living expenses." While Noel testified that he had cancelled checks as proof of the payments he made, he did not submit any cancelled checks or bank statements into the record except for one page of a November 30, 2019 statement showing one of the deposits he received from his inheritance totaling $7,267.94, and two pages of a statement that shows an electronic transfer of $1,000.00 to the joint Capital One account in February 2020. Nevertheless, based on his testimony, we find the trial court could have reasonably concluded that Noel used his separate inheritance money from November 2019 through February 2020 to pay the $2,000.00 per month to Lisa for ordinary expenses. While the Barksdale accounts were joint accounts, it appears uncontested that once Noel deposited his inheritance funds in those accounts, no other community funds were deposited.

A judgment of divorce terminates the community of acquets and gains retroactively to the date of the filing of the divorce petition. La.Civ.Code art. 159. Again, La.Civ.Code art. 2365 allows reimbursement when "separate property of a spouse has been used either during the existence of the community property regime or thereafter to satisfy a community obligation[.]"

We cannot say how the trial court arrived at a reimbursement of $36,277.00 based on payments of $2,000.00 and $1,000.00. Nothing in the record accounts for the $277.00. We note that the "date of separation" is referred to frequently in the record, but prior to the retroactive date of termination of the community, February 27, 2020, the only funds Noel would be entitled to are those he proved to be his separate property. Noel is not entitled to reimbursement for the payments made from June 2019, until he received his inheritance in November 2019, as the funds

52

used to make those payments were community property. Thus, we find the trial court manifestly erred in awarding Noel payments from the date of separation equaling $10,000.00 (five months at $2,000.00 per month) until the date he received his inheritance. The trial court did not err in attributing the $2,000.00 payments from November 2019, through February 2020, as Noel's separate property. Therefore, Noel is entitled to $8,000.00 in reimbursement for the payments he made into the joint account in November 2019, December 2019, January 2020, and February 2020.

Regarding the payments made subsequent to termination, Noel provided no documentary evidence to support the claims, but the testimony was clear from both parties that he paid the $2,000.00 and $1,000.00. Therefore, Noel is entitled to reimbursement for the remaining payments from termination until partition which amounts to $2,000.00 per month for March 2020 and April 2020, and $1,000.00 per month for May 2020 thru July 2021 (15 months for a total of $15,000.00 + $4,000.00 = $19,000.00). Accordingly, we amend the trial court's award of $36,277.00 to $27,000.00. Noel is therefore entitled to one-half of that amount in reimbursement, $13,500.00.

Finally, despite significant effort on our part, we are unable to reconcile the math in the trial court's written judgment with the math in the hearing partitioning the property. One such example is that Noel requested $65,800.00 in reimbursement but was awarded $158,298.82. According to Lisa, the judgment was prepared by Noel's counsel without her input. Of notable concern is the possibility that the reimbursement claims were not properly halved. In *Carmichael v. Brooks*, 16-93 (La.App. 3 Cir. 6/22/16), 194 So.3d 832, *writs denied*, 16-1396, 16-1501 (La. 11/7/16), 209 So.3d 100, the appellate court was faced with similar issues and remanded for recalculation in light of its rulings. Similarly, we feel a

remand is necessary in order to recalculate assets, liabilities, and reimbursements with attention given to halving as required by law, taking into consideration the findings above and with the input of both Lisa and Noel's counsel.

## CONCLUSION

We affirm the trial court's rulings relating to Lisa's MidAmerica retirement plan; the home appraisal value of $590,000.00; the reimbursement award to Lisa for insurance premium payments in the amount of $9,224.26; the reimbursement award to Lisa for the Montana tractor in the amount of $4,500.00; the award of $77.00 in reimbursement to Noel for transcript costs; the award of $250.00 in reimbursement for the appraisal fee; the reimbursement award of $12,920.08 to Noel for health, vision, and dental insurance payments; the reimbursement award to Noel for $7,795.00 in mortgage payments; and the reimbursement to Noel of $41,400.00 for rental reimbursement.

We find the trial court manifestly erred in the following awards and amend as follows: the reimbursement award to Lisa for car loan payments is amended to $17,550.62; for credit card payments to $8,376.00; the award to Noel for property taxes is amended to $429.67; the award to Noel for "deposits into joint account" to $27,000.00.

We find no manifest error in the trial court's ruling relating to the Schamerhorn debt but order the trial court to amend the judgment to reflect same.

We amend the trial court's ruling to reflect that Lisa is entitled to one half of the community funds existing in the former joint accounts at the time of termination, in the amount of $2,442.63.

We reverse the reimbursement award of $2,030.02 for payments on children's "insurance premiums," and the award for "Yates estate" in the amount of $39,262.38. This case is remanded for proceedings consistent with this opinion.

54

Costs of this appeal are assessed equally between the parties, Noel W. Yates and

Lisa J. Yates.

**AFFIRMED AS AMENDED; REVERSED IN PART;
AND REMANDED.**